[No. A113172. First Dist., Div. Five. Mar. 1, 2007.]

RYAN WALSH et al., Plaintiffs and Appellants, v.
IKON OFFICE SOLUTIONS, INC., Defendant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I.E. and II.E.

**COUNSEL**

Qualls and Workman, Daniel H. Qualls and Robin G. Workman for Plaintiffs and Appellants.

Seyfarth Shaw, Gilmore F. Diekmann, Jr., Catherine Dacre, Eric E. Hill, Alfred L. Sanderson, Jr., Francis J. Ortman III and Joel M. Van Parys for Defendant and Respondent.

**OPINION**

**GEMELLO, J.**—Plaintiffs Ryan Walsh (Walsh) and Kevin Miller (Miller), on behalf of themselves and others similarly situated, appeal from an order decertifying one of several subclasses in their class action against respondent IKON Office Solutions, Inc. (IKON). Appellants contend: (1) the order is erroneous because it fails to identify sufficiently the court's reasons for decertification; (2) the evidence does not support the trial court's conclusion; and (3) IKON's motion was untimely and procedurally defective in its failure to comply with local rules of the San Francisco Superior Court.

We affirm the order. In the published portion of our opinion, we rule that the trial court used proper criteria and sufficiently set forth its reasons for decertification, and that substantial evidence supports the court's order. In the unpublished portion of the opinion, we conclude that appellants' procedural objections to the decertification motion are without merit.

## I.   FACTS AND PROCEDURAL HISTORY

Respondent IKON provides document copy services to attorneys through its legal document services (LDS) division. IKON's account managers service the LDS customers. Appellants Walsh and Miller are alleged to be former IKON account managers.

According to IKON's policies, as well as in practice, the account managers are responsible for direct sales activities—such as cold-calling potential customers, making sales presentations, and taking orders for jobs—as well as activities such as transporting documents from customers to IKON reproduction facilities, quality checking the copies, correcting reproduction errors, advising customers of the status of their copy jobs, and delivering the copies to the customer.

### A.   Appellants' Class Action

Appellant Walsh and another former IKON employee filed this action in their individual capacities, and on behalf of similarly situated IKON employees (see Code Civ. Proc., § 382) and the general public (see Bus. & Prof. Code, § 17204), alleging that IKON had violated California's wage and hour

laws. According to the April 2004 amended complaint, IKON required certain employees to work in excess of eight hours per day, and in excess of 40 hours per week, without paying overtime wages as required by the Labor Code and applicable industrial welfare commission orders.[1] In addition, it was alleged, IKON failed to compensate employees for work without meal and break periods (Lab. Code, § 226.7), unlawfully deducted costs and expenses from wages (Lab. Code, §§ 204, 221), and failed to pay commission wages (Lab. Code, §§ 204, 221). Based on these statutory violations, IKON allegedly perpetrated unlawful, unfair, and fraudulent business practices (Bus. & Prof. Code, § 17200) and was liable for civil penalties under Labor Code section 2698.

## B. *Order Granting Class Certification*

On November 10, 2004, Walsh filed a motion for class certification, identifying the class as persons employed by IKON "between March 8, 2000, and the present."[2] Five subclasses were proposed, the fourth of which is most important for purposes of this appeal: (1) California employees paid overtime wages, hourly rate pay, and other compensation in a single pay period; (2) California employees for whom a "DSO" adjustment reduced commission wages; (3) California employees subject to business expense reimbursement limits and business expense deductions from payroll checks; (4) *IKON LDS account managers employed in California between March 8, 2000, to the present*; and (5) IKON sales representatives who procured equipment service agreements in effect upon termination of IKON's copy management program (CMP) on or about 1998 which remained in effect after March 8, 2000.

As to the fourth subclass defined as "IKON LDS Account Managers employed in California between March 8, 2000, to the present" (Account Manager Subclass), Walsh noted that IKON classified the account managers as exempt from overtime wage laws under the outside salesperson exemption. (See Lab. Code, § 1171; Industrial Welfare Commission wage order No. 4-2001, subds. 1(C), 2(M) (hereafter IWC Wage Order 4-2001), codified at Cal. Code Regs., tit. 8, § 11040, subds. 1(C), 2(M) [outside salesperson is

---

[1] Labor Code section 1194, subdivision (a), authorizes an employee who received less than the applicable legal minimum wage or overtime compensation to seek recovery from the employer. California employees are generally entitled to overtime pay for work of more than eight hours a day and 40 hours per week. (See, e.g., Lab. Code, § 510; Cal. Code Regs., tit. 8, § 11070 et seq.) There are, however, some employees who are exempt from the overtime law, such as outside salespersons. (Lab. Code, § 1171.)

[2] The motion was based on the allegations of the first amended complaint and a proposed second amended complaint.

one who works more than half of his or her working time away from the employer's place of business in sales activity].) Walsh asserted, however, that IKON based this classification on federal rather than California law, without observing the actual work the account managers performed. Further, Walsh argued, the account managers in the Account Manager Subclass were misclassified because they spent more than half of their worktime on *non*exempt activities, rather than on sales activity germane to the outside salesperson exemption. In support of this argument, declarations from 20 putative class members averred that all account managers engaged in the same nonexempt work activities for more than 50 percent of their worktime. Pursuant to IKON policies, those activities include: (1) picking up and delivering documents and materials from customers to be copied at the IKON plant; (2) quality checking orders before return to IKON customers; (3) correcting errors discovered when documents are returned to customers; and (4) advising IKON customers regarding the status of pending reproduction jobs. Walsh asserted that the uniform nature of the account managers' job descriptions and actual work meant that common questions of law and fact predominated over individual issues, thus warranting class certification. (See generally Code Civ. Proc., § 382.)

On February 28, 2005, Judge McBride certified the class with the requested subclasses, including the Account Manager Subclass.

### C. The Second Amended Complaint

Appellants' second amended complaint was filed in March 2005, after appellant Miller had been added as a named party and class representative. The second amended complaint sought relief on behalf of the class certified by the court, including the Account Manager Subclass, based on the same six causes of action asserted in the first amended complaint, including the claim that IKON failed to pay overtime wages.

### D. Ikon's Answer and Affirmative Defenses

On April 1, 2005, IKON filed its answer to appellants' second amended complaint, asserting among other things that members of the Account Manager Subclass were exempt from overtime laws under the outside salesperson and commission sales exemptions. As its ninth affirmative defense, IKON alleged: "Plaintiffs' Complaint is barred because any failure of Defendant to pay overtime was not unlawful, unfair or fraudulent. At all times relevant and

material herein, the parties to this action either were outside salespersons and/or commissioned employees exempt from [sic] California Labor Code's and the Industrial Welfare Commission wage order's overtime compensation requirements."

E.  *Case Management Conference and Post-certification Discovery**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

F.  *IKON's Decertification Motion and Order Decertifying Subclass*

On November 23, 2005, IKON filed a motion to decertify the Account Manager Subclass, contending inter alia that common questions of law and fact did not predominate over individual issues, because whether subclass members were exempt from overtime wage law (based in part on the outside salesperson exemption) required individualized analysis of each subclass member's work circumstances. In support of its motion, IKON submitted as evidence excerpts from depositions of numerous current or former IKON employees, which demonstrated, in IKON's view, that variations in the manner in which account managers performed their duties during the class period required individual proof and demonstrated a lack of commonality requisite for class certification. IKON scheduled the decertification motions for hearing on December 23, 2005, the date set for the hearing on IKON's two motions for summary adjudication.

By ex parte application on November 28, 2005, appellants sought an order striking IKON's motion for decertification, on the grounds that the motion inter alia (1) was filed 22 days after the November 1, 2005, stipulated filing deadline; (2) failed to provide 60 days' notice of hearing (San Francisco Superior Court Class Action Manual (SFCAM), rule 9.23); and (3) failed to include an affidavit identifying newly discovered facts or explaining why the evidence was not available at the certification hearing (SFCAM, rule 9.23(5)).

The record contains no order expressly ruling on appellants' ex parte application, but the hearing on IKON's decertification motion went forward as scheduled on December 23, 2005, before Judge Ballati. By written order on January 11, 2006, the trial court decertified the Account Manager Subclass with the following explanation: "Common issues of law and fact do not predominate in this matter with respect to the LDS account manager class, as the circumstances of each class member's employment differs significantly from every other member of the class. As a result, individual hearings on both liability and damages are required for each of the 150 or so class

---

*See footnote, *ante,* page 1440.

members, as well as the two class representatives, Walsh and Miller. In these circumstances, and on the evidence presented in support of and in opposition to the motion, the Court concludes that common issues of law or fact do not predominate."[3]

## II. DISCUSSION

Appellants contend that (1) the order decertifying the Account Manager Subclass failed to explain in detail why decertification was appropriate; (2) the evidence did not support the conclusion that common issues of fact and law do not predominate; and (3) IKON's decertification motion was untimely and did not comply with SFCAM, rules 9.23, 9.23(5), 9.24, and 9.27(2). IKON disagrees with these contentions and further asserts that the appeal should be dismissed, because the decertification order is not directly appealable. We address the last issue first. Then, after revisiting basic principles of class certification, we consider each of appellants' contentions.

### A. Appealability and Jurisdiction

█ An order denying a class certification motion in its entirety, and preserving only a claim for damages for the individual plaintiff, "is tantamount to a dismissal of the action as to all members of the class other than plaintiff." (*Daar v. Yellow Cab Co.* (1967) 67 Cal.2d 695, 699 [63 Cal.Rptr. 724, 433 P.2d 732] (*Daar*).) Thus, an order denying class certification has the legal effect of a final judgment—from which an appeal lies—if it "virtually demolishe[s] the action as a class action." (*Ibid.*; see *Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435 [97 Cal.Rptr.2d 179, 2 P.3d 27] [order denying certification to an entire class is an appealable order] (*Linder*).) By the same logic, an order decertifying a class would be directly appealable if it "virtually demolishe[s] the action as a class action." (*Daar, supra,* at p. 699.)

An order denying certification is not directly appealable, however, if it does not dispose of the class claims in their entirety. Thus, an order of *partial* decertification may not be appealable. (*Green v. Obledo* (1981) 29 Cal.3d 126, 149, fn. 18 [172 Cal.Rptr. 206, 624 P.2d 256] (*Green*); see *Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 806–807 [94 Cal.Rptr. 796, 484 P.2d 964] (*Vasquez*) [order dismissing one class cause of action and leaving another intact must be reviewed by writ of mandate].) In *Green,* for example, there

---

[3] IKON had also brought a motion to decertify the business expense reimbursement subclass. The motion was denied and the matter proceeded to trial, in which IKON prevailed.

was "significant overlap" between the portion of the class that was decertified and the rest of the class that remained in the case, such that they were not "separate and distinct." (*Green, supra,* at p. 149, fn. 18.) Accordingly, the order of partial decertification was not " 'tantamount to a dismissal of the action as to all members of the class' " and was not immediately appealable. (*Ibid.*)

In the matter before us, the order of partial decertification, from which Walsh and Miller filed their notice of appeal, stated: "Plaintiffs' LDS account manager class allegations are hereby dismissed without prejudice to the claims of the individual members of the class, including the two class representatives." In IKON's view, this order decertified the class action as it pertained to the cause of action for unpaid overtime, but members of the Account Manager Subclass remained in the case as members of the business expense reimbursement subclass, which went to trial in March 2006, and as members of the DSO and deductions classes, whose claims were settled. IKON urges there was significant overlap between the Account Manager Subclass that was decertified and the subclasses that remained certified and, as in *Green* and *Vasquez,* the order did not entirely dispose of the class claims. Furthermore, IKON contends, permitting piecemeal appeals of certification orders would cause undue delay and expense.

Appellants counter that the claims presented by the Account Manager Subclass were separate and distinct (whether or not the members of the subclass had other claims as members of other subclasses), because no other subclass sought recovery for overtime compensation. The decertification order ended the action as to all the claims of the Account Manager Subclass, even though it did not necessarily end the case in its entirety for Account Manager Subclass members who were members of another subclass.

In the end, we need not decide whether the decertification order itself was an appealable order, since Walsh and Miller not only filed a notice of appeal from that order, but also filed a notice of appeal from the final judgment. If in fact the decertification order was immediately appealable, appellants' notice of appeal from that order was timely. If the decertification order was not immediately appealable, and an appeal could be taken only from the subsequent judgment, appellants filed a protective notice of appeal from the judgment on September 5, 2006. (A modified judgment was entered in August 2006; appellants filed a timely notice of appeal from the modified judgment on October 16, 2006.)[4] Therefore, whether the decertification order was immediately appealable or not, appellants have preserved their right of review and this court has jurisdiction. Because the issues raised by appellants

---

[4] By request for judicial notice, appellants have brought to our attention the notice of appeal filed on October 16, 2006. We grant the unopposed request.

have been fully briefed by the parties in this appeal, and the appeal from the judgment (*Walsh v. IKON Office Solutions, Inc.* (A115362)) is only in its early stages, we proceed to address appellants' contentions at this time in the interest of judicial efficiency.

### B. *Legal Principles Pertaining to Class Certification*

■ Code of Civil Procedure section 382 authorizes class actions when "the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court." To maintain a class action, the class proponent must demonstrate that there is an ascertainable, manageable class of plaintiffs and a well-defined *community of interest* among class members, such that litigating the controversy as a class action would be a superior method of resolving the dispute and of substantial benefit to the litigants and the court. (*Daar, supra,* 67 Cal.2d at p. 704; see *Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 913 [103 Cal.Rptr.2d 320, 15 P.3d 1071] [proponent of class has the burden to prove the elements for class treatment].) The community of interest requirement is established if (1) common issues of law or fact predominate over issues unique to individual class members; (2) the class representatives have claims typical of the class; and (3) the class representatives will adequately present the class. (*Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 470 [174 Cal.Rptr. 515, 629 P.2d 23].) Of these three requirements, the parties to this appeal address only the element of commonality.

In examining whether common issues of law or fact predominate, the court must consider the plaintiff's legal theory of liability. (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326–327 [17 Cal.Rptr.3d 906, 96 P.3d 194] (*Sav-On*).) The affirmative defenses of the defendant must also be considered, because a defendant may defeat class certification by showing that an affirmative defense would raise issues specific to each potential class member and that the issues presented by that defense predominate over common issues. (*Gerhard v. Stephens* (1968) 68 Cal.2d 864, 913 [69 Cal.Rptr. 612, 442 P.2d 692]; *Kennedy v. Baxter Healthcare Corp.* (1996) 43 Cal.App.4th 799, 811 [50 Cal.Rptr.2d 736].)

Here, appellants contend that the account managers were entitled to overtime pay under Labor Code section 510, and that IKON misclassified them as exempt from this overtime requirement.[5] As an affirmative defense, IKON contends that the subclass members were exempt from overtime laws

---

[5] Appellants argue that two legal theories underlie their cause of action for violation of the overtime pay law: (1) deliberate misclassification—willfully classifying employees without regard to the actual work performed and pursuant to federal rather than state law; and

under the outside sales person exemption, which may apply to employees who spend more than half their time outside the office on sales activity. (*Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785 [85 Cal.Rptr.2d 844, 978 P.2d 2] (*Ramirez*).) Therefore, the question is whether common questions of law and fact do not predominate, such that class treatment is inappropriate, because determining whether the outside salesperson exemption applied to members of the Account Manager Subclass would require individualized examination of the circumstances of the account managers' activities.[6]

We review a trial court's ruling on class certification for abuse of discretion. (*Sav-On, supra,* 34 Cal.4th at p. 326.) Because of the great discretion afforded the trial court in this context, we will not reverse the court's ruling, if supported by substantial evidence, " ' "unless (1) improper criteria were used [citation]; or (2) erroneous legal assumptions were made." ' " (*Sav-On, supra,* at pp. 326–327.) We turn to appellants' contentions that the trial court employed improper criteria and that the court's conclusion was not supported by substantial evidence.

### C. The Court Used Proper Criteria in Decertifying the Account Manager Subclass

The "proper legal criterion" for deciding whether to certify or decertify a class is simply whether the class meets the requirements for class certification. (See *Sav-On, supra,* 34 Cal.4th at p. 332.) As a general matter, this pertains to the fundamental question whether " 'the class action proceeding is superior to alternate means for a fair and efficient adjudication of the litigation.' " (*Ibid.*) More particularly, whether common questions of law and fact predominate constitutes a proper criterion for certifying or decertifying a class. (*Grogan-Beall v. Ferdinand Roten Galleries, Inc.* (1982) 133 Cal.App.3d 969, 975–977 [184 Cal.Rptr. 411] (*Grogan-Beall*) [decertification of class was based on proper criterion where the court determined there was a lack of commonality].)

In the matter before us, the trial court expressly granted IKON's decertification motion on the ground of insufficient commonality. The court explained: "Common issues of law and fact do not predominate in this matter

(2) de facto misclassification—classifying employees inaccurately in light of the actual work they performed. (See generally *Sav-On, supra,* 34 Cal.4th at p. 329.) We discuss these theories *post.*

[6] In seeking decertification of the Account Manager Subclass, IKON also asserted that members of the subclass could be subject to the commissioned sales exemption and the administrative exemption to California's overtime laws. Because we conclude there was substantial evidence supporting the conclusion that commonality was lacking with respect to proof of the outside salesperson exemption, we need not consider whether adjudication of the commissioned sales exemption and administrative exemption would yield the same result.

with respect to the LDS account manager class, as the circumstances of each class member's employment differs significantly from every other member of the class. As a result, individual hearings on both liability and damages are required for each of the 150 or so class members, as well as the two class representatives, Walsh and Miller. In these circumstances, and on the evidence presented in support of and in opposition to the motion, the Court concludes that common issues of law or fact do not predominate." The court implicitly concluded that this lack of commonality prevented class treatment from being a superior means of adjudicating the claims of the Account Manager Subclass. The decertification order was based on proper criteria. (*Sav-On, supra*, 34 Cal.4th at p. 332; *Grogan-Beall, supra*, 133 Cal.App.3d at pp. 975–977.)

Appellants complain that the trial court did not identify the reasons for its conclusion that commonality was lacking, such as the particular circumstances that were different among class members and the legal criteria that rendered these differences material. Appellants insist that this detailed explanation is necessary, relying on the following quotation, which they represent can be found in *Grogan-Beall, supra*, 133 Cal.App.3d 969: "Simply stating, without explanation of any kind, that common issues of fact did not predominate does not suffice. A trial court must state the reasons for its conclusion. The failure to do so denies plaintiff a right to review the legal assumptions or criteria applied by the trial court." The quotation does not appear anywhere in *Grogan-Beall.*

In fact, *Grogan-Beall* demonstrates that appellants' position is not meritorious. The court in *Grogan-Beall* stated: "Although the trial court *did not state its reasons* for the decertification order, it is clear from the record that the dispute over class treatment turned on the issue of commonality of interest in law and fact. Defendants' moving papers focused on the assertion that defendants' liability to each unnamed plaintiff would have to be individually litigated in various respects. [In light of the arguments in defendants' motion papers, it] is clear that the trial court's decertification order was based on insufficient commonality to justify class treatment." (*Grogan-Beall, supra*, 133 Cal.App.3d at p. 976, italics added.)

In the matter before us, the trial court did not explain at length why it concluded there was a lack of commonality. (Cf. *Linder, supra*, 23 Cal.4th at p. 436 [describing the specific reasons trial court found class certification inappropriate].) However, it did refer to different employment circumstances among the subclass members, stating that "the circumstances of each class

member's employment differs significantly from every other member of the class," that "individual hearings on both liability and damages are required for each of the 150 or so" members of the subclass, and that "common issues of law and fact do not predominate." The court also stated that it had "read and considered the papers submitted in support of and in opposition to the motion" and "heard and considered the oral arguments of counsel," which included substantial discussion of commonality with respect to the outside salesperson exemption. In context, the trial court's explanation was not so vague that we are unable to determine whether substantial evidence supports the decision. Appellants' challenge to the order on this ground is unavailing. (See *Sav-On, supra,* 34 Cal.4th at p. 332 [rejecting argument that trial court failed to explain basis for finding of commonality, where the court had examined the parties' contentions at the hearing and noted its reliance on the "moving papers" and admissible evidence].)[7]

### D. *Substantial Evidence Supports the Court's Finding of Lack of Commonality*

We next consider whether the trial court's conclusion—that the commonality requisite for class treatment was lacking—was supported by substantial evidence. The first part of our discussion focuses on IKON's evidence that the varying circumstances of each subclass member's employment rendered determination of the outside salespersons exemption dependent on individualized proof, which we conclude provides substantial evidence for the court's ruling. The second part of our analysis explains why appellants' contentions to the contrary are not persuasive.

### 1. *Evidence of Lack of Commonality*

IKON classified all members of the Account Manager Subclass under the outside salesperson exemption, alleged this exemption as an affirmative defense, and relied upon it in arguing that common questions of law and fact do not predominate.[8]

---

[7] Appellants argue repeatedly that the order must be reversed because the reasons for finding a lack of commonality are unclear. We do not share appellants' view on this point, and " ' "[a]ny valid pertinent reason stated will be sufficient to uphold the order." ' " (*Sav-On, supra,* 34 Cal.4th at pp. 326–327 [certification order].) *Quacchia v. DaimlerChrysler Corp.* (2004) 122 Cal.App.4th 1442 [19 Cal.Rptr.3d 508], cited by appellants, is not to the contrary. There it was observed that a reviewing court will consider "only the reasons given by the trial court for the denial" of class certification and "ignore any other grounds that might support denial." (*Id.* at p. 1447.) Here, the trial court's reasoning is discernable from the court's statements and context.

[8] As appellants assert, exemptions from statutory mandatory overtime provisions are narrowly construed, and the employer bears the burden of proving the employee's exemption as an affirmative defense. (*Ramirez, supra,* 20 Cal.4th at pp. 794–795.) The question before us,

■ The outside salesperson exemption is set forth in Labor Code section 1171, which states: "The provisions of this chapter. [including Labor Code section 1194] shall apply to and include men, women and minors employed in any occupation, trade, or industry, whether compensation is measured by time, piece, or otherwise, but *shall not include any individual employed as an outside salesman . . . .*" (Italics added.) IWC Wage Order 4-2001, subdivision 2(M), defines an "outside salesperson" as: "[A]ny person, 18 years of age or over, who *customarily and regularly works more than half the working time away from the employer's place of business selling* tangible or intangible items or obtaining orders or contracts for products, services or use of facilities." (Italics added.) The outside salesperson exemption turns on how the employee actually spends his or her time as well as the employer's realistic expectations of the job and the extent to which the employee diverges from them. (*Ramirez, supra*, 20 Cal.4th at pp. 790, 802–803.)

IKON submitted evidence that the account manager positions were designed to be, and class members expected them to be, outside sales positions. Such evidence demonstrated that IKON pays the account managers a commission on their transactions and measures their performance based on sales quotas and the account manager's satisfaction of specific sales activity requirements, including the number of cold calls, client visits, and face-to-face contacts, as well as sales revenue. Indeed, IKON characterizes all the things that the account manager does, including the five core tasks appellants contend are *non*exempt activities common to all account managers, as part of the sales process.

■ Employer job descriptions and expectations alone, however, do not necessarily establish the outside salesperson exemption. (*Ramirez, supra*, 20 Cal.4th at p. 802; *Sav-On, supra*, 34 Cal.4th at p. 337.) Moreover, since the job descriptions were common to all Account Manager Subclass members, that evidence does not advance IKON's contention that commonality is lacking. (See *Sav-On, supra*, at p. 337 [under the facts presented, considerations such as the employer's realistic expectations of the employee's work and the actual requirements of the job were likely susceptible of common proof].)

The lack of commonality is suggested, however, in the manner and extent these common functions were actually performed by the account managers. IKON presented evidence, from deposition testimony of appellant Miller and others, that the performance of these tasks varied significantly from individual to individual and from office to office, based on the account manager's

---

however, is not whether IKON proved its defense, but whether it presented evidence from which the trial court could reasonably conclude that the adjudication of the defense would turn more on individualized questions than on common questions.

territory, number of customers and job orders, support from customer service representatives (CSR's), and the personal approach of each account manager to the job and customers. For example, Miller testified that the way he performed his job varied dramatically in the two offices in which he worked and that his work varied depending on the number and type of customers, the customer's volume of business, and the number of CSR's available to him. Further, Miller noted, the number of CSR's varied among account managers, he did not know and could not say how other account managers performed their jobs, and each account manager would have to be asked individually.

Other evidence supported IKON's contention of a variation in work performance among account managers. IKON submitted declarations and deposition testimony indicating that account managers differed in the amount of time they spent outside the office, which is relevant because the outside salesperson exemption requires that the employee spend more than half of his or her worktime outside the work place. According to this evidence, many account managers spent more than 50 percent of their working time outside the office, while some spent 40 percent or less of their working time outside the office. Moreover, the outside salesperson exemption requires that the employee's time outside the office be spent on sales-related activity, and in this regard there was variance among subclass members as well: some spent considerable amounts of time engaged in sales activities, some spent a moderate amount of time, and some spent minimal time.[9]

There was also variance among subclass members in the amount of time spent on separate sales appointments, the time spent managing or overseeing the copying production process and checking the quality of the product, and the number of orders the account managers received. There was variance in whether the account manager had an assigned CSR, which affected the amount of time an account manager could spend on direct sales activities.

Lastly, there was variance in the extent to which account managers used pickups and dropoffs as sales opportunities. For example, Miller spent most of his time on a combination of pickup, delivery, and other outside activities, but he did not consider pickups and deliveries to constitute sales activity. Other class members performed and treated the pickups and deliveries differently, the way IKON conceptualized it, as part of sales work. Leamer, for instance, testified that his pickup and delivery of customer documents was, for him, a sales opportunity.

---

[9] For example, Alexander asserted in her declaration that she spent 60 to 70 percent of her time out of the office in sales activities; Biasotti estimated that more than 70 percent of her time outside the office involved sales-related activities; and Leamer testified that he spent 60 to 70 percent of his time on sales-related activities. Other account managers spent less than 50 percent of their time on sales-related activities, such as Hall (2–5 percent), Hilts (5 percent), and Toro (5 percent of time inside office and 5 percent of time outside office).

These variations among account managers are material to deciding whether each subclass member was properly classified under the outside salesperson exemption: the time they spent outside the office in sales, whether outside activities such as pickups and dropoffs were used as part of their selling activities, and factors such as orders, CSR's, sales appointments, and other individual circumstances would affect whether any particular subclass member did, in fact, "customarily and regularly" spend over 50 percent of his or her time outside the office on sales activity. (IWC Wage Order 4-2001, subd. 2(M); see *Nordquist v. McGraw-Hill Broadcasting Co.* (1995) 32 Cal.App.4th 555, 565 [38 Cal.Rptr.2d 221] [whether an employee is exempt is a factual question]; *Ramirez, supra,* 20 Cal.4th at p. 794 [meaning of term "outside salesperson" is question of law, but what work the employee actually performs is a question of fact].)[10]

■ Our Supreme Court in *Ramirez* anticipated that the adjudication of the outside salesperson exemption could result in this very type of individualized factual examination: "If a salesperson must travel one hour to destination A in order to attempt a sale, then surely the most reasonable interpretation of [Wage Order No. 7-80] is to count the hour of travel time as time spent 'selling.' But if, as in the present case, an employee travels to a destination to engage in both sales and nonsales activities, the travel time must be apportioned among the two types of activities for purposes of determining the total amount of time spent doing sales and nonsales work." (*Ramirez, supra,* 20 Cal.4th at p. 801.) Further, the court admonished, the trial court must neither look solely to the employer's job description, nor solely to the hours worked in sales activity (which might be reduced by the employee's own substandard performance), but inquire into the realistic requirements of the job including not only how the employee spends his or her time but also whether the employee's practice diverges from the employer's realistic expectations and realistic views of the employee's performance. (*Id.* at p. 802.)

■ In the final analysis, there was a sufficient evidentiary basis from which the trial court could reasonably infer that commonality was lacking due to the differences in the subclass members' work circumstances and how they approached their jobs, such that each individual subclass member would have to establish entitlement to damages (liability) as well as the amount of damages. The court's conclusion that there was insufficient commonality to warrant certification of the Account Manager Subclass was therefore supported by substantial evidence and was not an abuse of discretion.

---

[10] Appellants correctly point out that a variation in the mix of work performed by class members does not, in itself, preclude class certification. (*Sav-On, supra,* 34 Cal.4th at p. 335.) But IKON's evidence is subject to the inference that these variations in the time spent outside the office, time spent on sales-related activities, and time correcting copy errors, as well as whether CSR support was used and the number of orders completed per day, are material in that they affect whether the amount of exempt work exceeds 50 percent.

2. *Appellants' Contentions Regarding the Outside Salesperson Exemption*

Appellants dispute this conclusion with four arguments. None compels reversal.

a.  Sav-On

Appellants contend that the decision in *Sav-On, supra,* 34 Cal.4th 319, held that the existence of factors relevant to proving the outside salesperson exemption under *Ramirez* did not preclude class certification. We disagree.

In *Sav-On,* the defendant had classified the plaintiffs as salaried managers, purportedly exempt from the overtime wage laws. (*Sav-On, supra,* 34 Cal.4th at p. 324.) In seeking certification of the class, plaintiffs argued that class members had been misclassified based on their job title and job descriptions, without reference to their actual work. When their actual work was considered, evidence suggested that class members generally performed *non*exempt work more than half of their workdays. (*Id.* at p. 325.) Opposing certification, the defendant contended that whether any individual member of the class is exempt from the overtime requirements turned on the tasks performed and the time actually spent on those tasks, both of which varied among the class members. (*Ibid.*) The trial court granted the certification motion, finding that common questions of law and fact predominated. (*Ibid.*) Upon review by our Supreme Court, the court decided that substantial evidence supported the conclusions that "deliberate misclassification was defendant's policy and practice" and that "classification based on job descriptions alone resulted in widespread de facto misclassification." (*Id.* at p. 329.) Emphasizing the great deference given to a trial court's certification order, our Supreme Court ruled that the court had not abused its discretion in certifying the class. (*Id.* at pp. 329, 331.)

Appellants here, arguing that our Supreme Court rejected the idea that the individualized proof referenced in *Ramirez* could preclude class certification, point us to several passages in *Sav-On* including the following: "Presence in a particular overtime class action of the considerations reviewed in *Ramirez* does not necessarily preclude class certification. Any dispute over 'how the employee actually spends his or her time' [citation], of course, has the potential to generate individual issues. But considerations such as 'the employer's realistic expectations' [citation] and 'the actual overall requirements of the job' [citation] are likely to prove susceptible of common proof." (*Sav-On, supra,* 34 Cal.4th at pp. 336–337.)

Contrary to appellants' suggestion, this passage does not compel reversal of the trial court's decision. We do not conclude that merely by raising the outside salesperson exemption, IKON *necessarily* insulated itself from class certification. Rather, the record suggests that the "dispute over 'how the employee actually spends his or her time' " *does* "generate individual issues" which, in the trial court's estimation, rendered commonality so lacking as to destroy the justification for class treatment of appellants' claims. (*Sav-On, supra,* 34 Cal.4th at pp. 336–337.) It was within the trial court's discretion to determine whether this lack of commonality rendered class certification inappropriate.

Appellants' reference to the following language in *Sav-On* is similarly unavailing: "Contrary to defendant's implication, our observation in *Ramirez* that whether the employee is an outside salesperson depends 'first and foremost, [on] how the employee actually spends his or her time' [citation] did not create or imply a requirement that courts assess an employer's affirmative exemption defense against every class member's claim before certifying an overtime class action." (*Sav-On, supra,* 34 Cal.4th at p. 337.)

Here again, the point was that defendants could not preclude certification per se merely because there were factual circumstances that might require individual proof; the *Sav-On* court did not strip the trial court of its discretion to conclude that, in light of the factual variations among individual employees, the class action device would not be a superior mechanism for adjudication of the claims.

To the contrary, the admonition to be gleaned from *Sav-On* is that a reviewing court must abide by the well-established deference afforded a trial court's determination of commonality. Appellants ignore the language in *Sav-On* emphasizing that point: "Presuming in favor of the certification order, as we must, . . . we cannot say it would be irrational for a court to conclude that, tried on plaintiffs' theory, 'questions of law or fact common to the class predominate over the questions affecting the individual members.' " (*Sav-On, supra,* 34 Cal.4th at p. 329, citation omitted; see also *id.* at p. 331.)

By the same measure, presuming in favor of the decertification order now before us, we cannot say it would be irrational for a court to conclude that, tried on appellants' theory, questions of law or fact common to the class do not predominate over the questions affecting individual class members. In accord with *Sav-On,* we affirm the trial court's order.

b. *Appellants' attack on IKON's evidence*

Appellants next challenge the evidence IKON submitted in regard to account managers Alexander, Biasotti, Leamer, Miller, and Bodenmann.

Appellants contend that the evidence was insufficient to establish that account managers spent considerable amounts of time in sales activities.

In particular, appellants contend that IKON's citation to Alexander's and Biasotti's declarations is misleading because they later testified in deposition that pickups and deliveries were *not* sales work, and that such work, in combination with the four other core tasks, constituted more than 50 percent of their work week.[11] But this apparent inconsistency in the witnesses' accounts does not prove that it was error to decertify the Account Manager Subclass; to the contrary, it underscores the likelihood that adjudicating the outside salesperson exemption will be best accomplished on an individual basis. After all, the credibility of each witness and the weight to be given his or her testimony is a matter for the trier of fact, who would consider each witness's trial testimony, inconsistencies in prior testimony or declarations, and any explanation for the change in testimony. The fact that a jury might have to decide which of Alexander's and Biasotti's versions to believe does not suggest that questions of fact or law common to the class predominate over individualized issues.

■ Appellants also contend that the trial court should have disregarded Alexander's and Biasotti's declarations because they were prepared before the original motion for certification and thus did not constitute newly discovered evidence. While it is true that a motion for decertification may not be brought in the absence of newly discovered evidence, the movant is not barred from also including evidence that might have been extant before, arguing that the new evidence, coupled with the existing evidence, dictates a different result.

Appellants' remaining challenges to IKON's evidence are unpersuasive as well. They contend that Miller's description of work he performed in an IKON Minnesota office in 1999 is irrelevant to the Account Manager Subclass, which was comprised of California account managers employed since March 8, 2000. The point of Miller's testimony, however, was that his work varied depending on his job circumstances, including which office he was in. While appellants point out that Leamer is not a class member because he opted out, he was nonetheless an account manager (and apparently a California employee during the class period, since he opted out of the class), and competent to testify to the variation in work among account managers. Lastly, appellants assert that Bodenmann's testimony was unreliable because he admitted that his recollections of work performed for IKON were based on speculation. Actually, he testified that some of the estimates he gave were

---

[11] Contrary to appellants' representation, they did not "disavow[]" their declarations, nor were their declarations even mentioned in the deposition excerpts that appellants have included in the record.

"more speculative, whatever the word, than others" because of the difficulty of being precise. This pertains to the credibility and weight of his testimony, a matter for the trier of fact. In sum, appellants' attacks on IKON's evidence do not establish that the trial court abused its discretion in decertifying the Account Manager Subclass.

### c. *The five common core tasks*

Based on class member declarations, as well as deposition testimony of current and former LDS account managers, appellants contend that account managers uniformly spent in excess of 50 percent of their work week during the class period, consistent with their job descriptions, on five core work tasks: (1) transporting documents to IKON's duplication facilities and back to customers; (2) checking in copy jobs at IKON's duplicating facilities following standard IKON production procedures; (3) performing quality control checks of copy jobs at IKON's duplication facilities before transporting jobs back to customers; (4) providing customers with updates regarding status of their copy jobs; and (5) correcting copy jobs reproduced in error. Appellants contend these five core tasks are nonexempt activities and commonality predominates because all account managers perform these tasks in excess of 50 percent of their worktime.

This was the premise on which appellants obtained class certification originally. There is no dispute that all Account Manager Subclass members perform the five core tasks, and the account managers testified that they spent "more than 50% of every work week performing the five core tasks." (Italics omitted.) Certainly this provides some evidence of commonality; it does not, however, compel the conclusion that the trial court erred in finding that commonality was lacking in light of the evidence IKON presented.

■ The evidence presented by IKON in its decertification motion suggested that, notwithstanding appellants' evidence of the five common core tasks, the manner in which some account managers performed those tasks indicated their work was actually exempt sales activity and not, as appellants contended, nonexempt activities. The issue of *whether* the work is exempt or nonexempt is not germane to a determination of class certification. (*Linder, supra*, 23 Cal.4th 429, 439–440 [merits of the case not relevant to whether class should be certified].) But the further point that resolving this issue—determining whether the work is exempt or nonexempt—will require consideration of each individual class member's particular work circumstances is certainly relevant to whether a class action is an appropriate mechanism for resolution of the parties' dispute. Here, whether the five core tasks accounting for the majority of each account manager's time was exempt or nonexempt

depends on each account manager's individual circumstances.[12] Accordingly, it was reasonable for the trial court to conclude that common questions of fact and law did not predominate.

### d. *Appellants' deliberate misclassification theory*

Appellants contend it was error to decertify the Account Manager Subclass, even if individualized proof of a subclass member's work *was* required to evaluate whether each member's work was exempt, because appellants pursued their overtime wage claim in part on a theory of "deliberate willful misclassification." Appellants contend that IKON willfully misclassified all members of the Account Manager Subclass by systematically deeming them all subject to the outside salesperson exemption, based on federal rather than California law and without observing the work they actually performed.[13] Because this deliberate misclassification is common to all Account Manager Subclass members, appellants argue, common questions predominate over individual issues.

We disagree. Appellants sought relief under Labor Code section 1194, which enforces the employee's right to overtime wages (Lab. Code, § 510), unless exempt. In arguing that IKON could be liable without regard to the work the account managers performed, appellants assume that an employer is liable if it classifies employees without regard to the law or investigating what work they do, even if the employees were, in fact, subject to the exemption. While such action on the part of an employer may be "deliberate" and "willful," it is not "misclassification."

In other words, appellants cannot recover under Labor Code section 1194 unless the Account Manager Subclass members were not, in fact, subject to the outside salesperson exemption; that determination requires consideration of the individual circumstances of each Account Manager Subclass member.

---

[12] Appellants' own evidence shows a great variation in the time account managers devoted daily to each of the five core duties: 2 to 8 hours transporting documents; 1 to 4 hours checking in copy jobs; 0.45 to 5 hours performing quality control checks; 0.5 to 2 hours providing customer updates; and 0.2 to 3 hours correcting copy jobs.

[13] As evidentiary support for their deliberate misclassification argument, appellants offered the deposition testimony of IKON's Christine McTaggert, who stated that IKON made the classification according to federal law and did not survey account managers in California during the class period to determine the work they actually performed. IKON argues that any misclassification was not deliberate because IKON intended the position to *be* an outside sales position and McTaggert did observe the work performed by account managers in Pennsylvania, albeit not California, believing that the work would be the same nationally.

Appellants argue that their theory was recognized in *Sav-On, supra,* 34 Cal.4th at page 329, referring us to the following passage: "The record contains substantial, if disputed, evidence that deliberate misclassification was defendant's policy and practice. The record also contains substantial evidence that, owing in part to operational standardization and perhaps contrary to what defendant expected, classification based on job descriptions alone resulted in widespread de facto misclassification. Either theory is amenable to class treatment." (Fn. omitted.) Plaintiffs in *Sav-On* argued that the defendant misclassified the employees, whether deliberately or as a result of a good faith mistake. It also appears that the court believed that plaintiffs had presented substantial evidence of *mis*classification under either theory, and class treatment would be appropriate under either theory. But it does not suggest that employers could be liable for classifying an employee without regard to the law or facts if the employees turned out to be classified correctly. Appellants do not provide any other authority for their position or cite any case interpreting *Sav-On* in the manner they suggest, nor have we found any.

In order to prove a violation of Labor Code section 1194, the factual question of whether the classification under the outside salesperson exemption was correct or not must be determined. The case would necessarily involve individualized proof precluding class treatment of the claim. Appellants fail to demonstrate that the trial court's finding of a lack of commonality was unsupported by substantial evidence.[14] (*Sav-On, supra,* 34 Cal.4th at p. 331 ["[T]he trial court was within its discretion to credit [defendant's] evidence . . . over [plaintiffs'], and we have no authority to substitute our own judgment for the trial court's respecting this or any other conflict in the evidence. [Citation.]"].)

E. *Procedural Objections to Decertification Motion**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[14] Appellants contend that the trial court erred in ruling that predominate commonality was lacking because proof of damages required individual hearings, since differences in damages between class members do not preclude class certification of overtime misclassification claims. (See *Sav-On, supra,* 34 Cal.4th at pp. 334–335.) The trial court did not conclude that commonality was lacking due to individualized issues of damages alone, but ruled instead that "individual hearings on *both liability and damages* are required for each of the 150 or so class members . . . ." (Italics added.)

*See footnote, *ante,* page 1440.

## III.  *DISPOSITION*

The order is affirmed.

Jones, P. J., and Simons, J., concurred.

On March 28, 2007, the opinion was modified to read as printed above.