[No. B210787. Second Dist., Div. Six. Nov. 4, 2009.]

EDYTHE KELLER et al., Plaintiffs and Appellants, v.
TUESDAY MORNING, INC., Defendant and Respondent.
MICHAEL BERNSTEIN, Plaintiff, v.
TUESDAY MORNING, INC., Defendant.

**COUNSEL**

Mower, Carreon & Desai and Aashish Y. Desai for Plaintiffs and Appellants.

Fulbright and Jaworski, Robert M. Dawson and Andrea M. Valdez for Defendant and Respondent.

**OPINION**

**COFFEE, J.**—Appellants are managers (managers) employed by respondent, Tuesday Morning, Inc. (TM). The managers filed a class action against TM, alleging that TM failed to pay overtime wages. The trial court denied certification. The Supreme Court subsequently issued an opinion addressing the standards for granting class certification. In light of the decision, the trial court reversed its position and granted the managers' motion to certify the class. Two years later, TM filed a motion to decertify the class. A different trial judge granted the motion on the ground that individual issues predominated over common issues, thus a class action was not the appropriate mechanism by which to litigate the managers' claims. We affirm.

## FACTS

Respondent TM is a retailer that sells brand-name merchandise at discounted prices. Its stores open during periodic "sales events" lasting from

three to eight weeks, and close for the remainder of the year. Employees work year round preparing for the sales. TM operates nationwide and has 80 stores in California. They vary in size from 4,227 square feet to 21,000 square feet, and are located in diverse communities.

The managers brought a class action against TM for unpaid overtime.[1] They alleged that TM had violated California wage and hour laws by misclassifying its managers as exempt. Edythe Keller is a former manager and the class representative.[2]

### Class Certification

The Honorable Frances Rothschild denied certification of the managers as a class. The Supreme Court then issued *Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319 [17 Cal.Rptr.3d 906, 96 P.3d 194] (*Sav-On*), and the managers filed a motion for reconsideration. The trial court reconsidered its decision in light of *Sav-On* and granted the motion for class certification on January 13, 2004. It concluded "that the common issues predominate and, at minimum, there are key issues which are susceptible of class treatment." Consistent with the *Sav-On* decision, the court stated, "Should it appear in the future that the action is no longer appropriate for class treatment, the Court has authority to decertify the class."

### Motion for Decertification

The parties conducted extensive discovery. On December 27, 2006, TM filed a motion to decertify the class. The matter was assigned for all purposes to the Honorable Alice E. Altoon. The motion was based on the declarations of five attorneys, three managers, the vice-president of store operations, and TM's expert. The declaration of Attorney Robert M. Dawson referenced the depositions of 49 additional managers.

TM's expert, David Lewin, is a professor of management at UCLA (University of California, Los Angeles) who specializes in the area of human resource management and industrial relations. Lewin declared that the managers perform "primarily" managerial work. He based his opinion on two videotapes (taped June 6, 2006, and Oct. 16, 2006) depicting the activities performed by two store managers during their shifts of seven and six hours,

---

[1] TM asserts there are 459 class members, while the managers contend there are 275 members.

[2] The present matter was consolidated with a related case, *Bernstein v. Tuesday Morning, Inc.*, BC271241.

respectively. The stores were located in Glendora and Woodland Hills. TM produced the videotapes (converted to DVD's), which were narrated by manager Joseph Chrisman.

Lewin described in detail the activities he observed on the DVD's. It was his opinion that the first manager spent 80 percent of her time performing managerial work and 20 percent performing nonmanagerial work. The second manager spent 90 percent on managerial and 10 percent on nonmanagerial work. Lewin noted that, according to TM training materials, the managers are responsible for each store's profit and loss and have an incentive plan. He declared this indicated that the managers are regarded as the general managers of their stores and part of TM's corporate management. Chrisman submitted a declaration stating that he had videotaped the two stores and photographed nine others to demonstrate that no two stores are alike.

The declaration of Attorney Danielle Clarkson addressed seven factors demonstrating the differences among the stores. They included store size, configuration, sales volume, number of employees, store demographics/location, number of other management personnel, management style and competence. Store size affects the amount and value of merchandise, and management time is spent deciding how to fit merchandise within the store, and the optimum location for sales. It also has a bearing on truck deliveries, planning, budgeting and scheduling.

According to Clarkson, another factor to be considered is the number of boxes delivered by truck on delivery days, which involve unloading and unpacking boxes and determining how merchandise should be displayed. Stores differ in the amount of time each manager spends processing returns and exchanges. Depending upon the store, managers have supervised between five and 22 employees. Clarkson alleged that the number of employees supervised directly affects managerial tasks, such as delegation, training, hiring, and scheduling.

In 2005, annual sales per store ranged from $800,000 in Santee, California, to $3.1 million in Torrance, California. Clarkson alleged that the larger stores do not necessarily generate higher sales volumes. The variety of locations of TM stores affects matters such as employee turnover and quality, customer type, customer preference and merchandising. Each store is configured differently, affecting the amount of square footage available for selling and stocking. A store might be located within a shopping center or next to a warehouse. The stores are located in diverse communities, described variously as "very wealthy," "working class," and "very suburban." A store

located in a high-crime area requires more employee training in loss prevention. All of the foregoing factors have a direct impact upon the time spent in managerial activities.

Deborah DaRue Slaver, a visual display manager, declared that managers attend training in the corporate office in Dallas, Texas, within 60 days of their hire, and return once a year for additional training. The training material includes information on fixture plans, product categories, types of displays, merchandising standards, product knowledge, pricing, markdowns and returns and exchanges. TM encourages mangers to use their own judgment and creativity. Slaver estimated that managers use their individual judgment approximately 85 percent of their time in merchandising and 15 percent of their time following fixed corporate directives. Because each TM store differs in size and configuration, each will reflect the individual personality of the manager.

Attorney Richard M. Kobdish submitted a declaration including a statistical analysis of the declarations of 45 managers concerning their time spent managing. They ranged from 10 percent to 100 percent. Kobdish considered the deposition of five other managers, who estimated they spend 90 percent to 112 percent of their time managing. Kobdish indicated that this was possible because many of the managers were constantly "multi-tasking." He concluded that, although the managers managed their stores in unique ways and spent differing amounts of time managing, all spend over 50 percent of their time engaged in managerial duties.

Attorney Andrea Valdez submitted a declaration concerning weekly variances in managers' duties. These included the number of sales associates present during different shifts; the number of truck deliveries and sales and the resulting increased work. The workload increased when there were seasonal changes, such as Christmas, and decreased when the store closed for inventory. After reopening, workload increased due to the number of returned items. Other factors included whether the manager had an assistant or regional manager who could help with management duties, or if the manager lacked management support, or spent extra time training a new manager.

Manager Lindsey Duran declared that certain factors vary between managers, such as managerial style, competence and retail experience. This affects matters such as merchandising decisions, sales volume, customer service, employee training and delegation of tasks. Some managers choose to perform tasks typically done by subordinates, while others choose solely to manage. Other managers simultaneously perform hourly work as well as managing.

Andy Paris is the vice-president of store operations for TM. He enumerated various management activities and declared that TM expects the managers to perform these duties at least 60 percent of the time. While managers learn general policies and procedures during training, due to the inherent differences between both stores and managers, these guidelines must be adapted by each individual. Managers are expected to utilize their independent judgment and discretion.

Attorney Brandon Fernald declared that some of the managers were not credible because they contradicted themselves within their declarations and deposition testimony as to the amount of time spent involved in managerial and nonmanagerial duties. There were also inconsistencies between the deposition testimony of managers and their employees. TM submitted extensive statistical evidence in support of their allegations.

### Opposition to Decertification Motion

On May 1, 2007, the managers filed opposition to TM's motion to decertify the class. They argued that common issues predominated because TM (1) has treated managers as exempt since the date of their employment; (2) has established budgets and policies; (3) provides the same training and expects the same performance from all its managers; and (4) its chain store operation is designed to ensure that all managers perform the same or similar tasks. The managers asserted that common issues included a determination as to what tasks are exempt and nonexempt, what constitutes the exercise of independent judgment and what activities constitute "multi-tasking."

The managers requested that, should the court determine class certification to be inappropriate, that it nevertheless maintain certification of the issues outlined above, as well as numerous factual matters related to training, job descriptions, corporate procedures and store operation. They alleged that issue certification or the formation of subclasses would make the litigation more manageable for both the court and the parties, and that numerous lawsuits concerning the common facts would be costly and inefficient.

TM filed a reply to the managers' opposition. It asserted that Judge Rothschild's decision to reverse her ruling and grant certification reflected her expectation that the issue would be reexamined after further discovery. TM contends that only after extensive discovery could it be determined whether a wage and hour case was properly suited as a class action.

*Hearing on Decertification Motion*

The matter was assigned to the Honorable Judge Aurelio Munoz, who presided over a three-day hearing on the decertification motion. On August 18, 2008, he issued an order decertifying the class. In a written ruling, the court concluded that, even though there was a common issue as to whether the store managers were improperly classified as exempt employees, the individual inquiry predominated over any common inquiry. The court noted that TM's numerous stores varied in size, layout, socioeconomic makeup, the number of employees and the manner in which the managers conduct their supervisorial duties.

The court observed that the question of mandated management policies was subject to classwide proof, yet the amount of time a manager spent performing these acts and his or her exercise of discretion are matters of individual inquiry. The court indicated that the amount of time each manager works could be easily determined by reference to pay records. However, the time spent in a managerial duty is an individual inquiry. Each manager's background and management style varied from store to store. Moreover, many of the managers who filed declarations for TM were impeached by their deposition testimony.

## DISCUSSION

■ The managers argue that TM misclassified them as exempt to avoid paying overtime. An employee may be exempt from the requirement of overtime compensation if the employee "is primarily engaged in the duties that meet the test of the exemption, [and] customarily and regularly exercises discretion and independent judgment in performing those duties . . . ." (Lab. Code, § 515, subd. (a).) On appeal, the managers contend the trial court abused its discretion by granting TM's motion to decertify the class.

*Requirements for Class Certification*

■ Class actions are authorized when there is a question of "common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all." (Code Civ. Proc., § 382.) "The party seeking certification has the burden to establish the existence of both an ascertainable class and a well-defined community of interest among class members. [Citations.]" (*Sav-On, supra,* 34 Cal.4th at p. 326 [affirming order granting certification]; see *Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal.4th

1096, 1104 [131 Cal.Rptr.2d 1, 63 P.3d 913] [reversal of order granting certification].)

■ "The 'community of interest' requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class. [Citation.]" (*Sav-On, supra,* 34 Cal.4th at p. 326.) The matter before us concerns the grant of an order *decertifying* a class. ■ The "community interest" analysis applies equally to an order decertifying a class as well as an order granting certification. (See *Walsh v. IKON Office Solutions, Inc.* (2007) 148 Cal.App.4th 1440, 1450–1451 [56 Cal.Rptr.3d 534] [order decertifying subclass].) A class action " 'will not be permitted . . . where there are diverse factual issues to be resolved, even though there may be many common questions of law.' [Citation.]" (*Block v. Major League Baseball* (1998) 65 Cal.App.4th 538, 542 [76 Cal.Rptr.2d 567].)

### Standard of Review

We review the trial court's ruling for an abuse of discretion. (*Sav-On, supra,* 34 Cal.4th at p. 326.) Our task is to determine whether the record contains substantial evidence to support the trial court's predominance finding. (*Id.* at p. 328.) A valid pertinent reason will be sufficient to uphold the order. (*Id.* at p. 327.) We will not reverse the trial court's ruling, if supported by substantial evidence, unless improper criteria were used or erroneous legal assumptions were made. (*Id.* at pp. 326–327.)

■ Whether to certify a class is a procedural matter, and does not require a consideration of the merits of an action. (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 439–440, 443 [97 Cal.Rptr.2d 179, 2 P.3d 27] [reversal of order denying certification].) In order to successfully utilize the class action as a tool, "trial courts must be accorded the flexibility 'to adopt innovative procedures, which will be fair to the litigants and expedient in serving the judicial process.' [Citations.]" (*Id.* at pp. 439–440.) However, the court retains the option of decertifying the class if unanticipated or unmanageable individual issues arise. (*Sav-On, supra,* 34 Cal.4th at p. 335.)

### Unpaid Overtime in Chain Retail Class Actions

In *Sav-On,* drugstore managers filed a class action against the store, arguing that *Sav-On* had misclassified them based on their job title and description, without reference to their actual work. They claimed that they

performed nonexempt work for over half of each workday. *Sav-On* defended by arguing that exempt status turned upon the tasks performed by each employee, and the time actually spent performing them, factors which varied among the class members. The Supreme Court determined that substantial evidence supported the conclusion that the employees had been deliberately misclassified. (*Sav-On, supra,* 34 Cal.4th at pp. 324–325, 329.)

The Supreme Court emphasized the deference given to a trial court's certification order and concluded that substantial evidence supported its decision to certify the class. (*Sav-On, supra,* 34 Cal.4th at p. 329.) In reaching its conclusion, the Supreme Court noted that the trial court could properly have relied on a single declaration to support class treatment. (*Id.* at p. 334.)

Instructive are two appellate decisions concerning unpaid overtime in retail chain operations, decided after *Sav-On: Walsh v. IKON Office Solutions, Inc, supra,* 148 Cal.App.4th 1440 (*Walsh*) and *Dunbar v. Albertson's Inc.* (2006) 141 Cal.App.4th 1422 [47 Cal.Rptr.3d 83]. In *Walsh,* two account managers filed a class action against their former employer, IKON Office Solutions. IKON had classified the account managers as exempt from overtime wage laws under the outside salesperson exemption. This exemption requires that the employees spend more than half of their worktime outside the workplace. (*Walsh, supra,* at p. 1455.)

IKON moved to decertify the account manager subclass, contending that common questions of law and fact did not predominate over individual issues. It argued that the account manager positions were designed to be outside sales positions in which account managers were paid a commission on their transactions. Their performance was determined by sales quotas and accomplishing specific sales activity requirements. (*Walsh, supra,* 148 Cal.App.4th at p. 1454.) IKON presented evidence that the performance of the managers' primary functions varied significantly, depending upon territory, number of customers, job orders, support from customer service representatives and the personal approach of each manager. (*Ibid.*)

The trial court granted the motion, noting that individualized analyses of each subclass members' work circumstances would be required. As a result, individual hearings on both liability (time spent on exempt versus nonexempt tasks) and damages (number of overtime hours worked) would be necessary for each of the class members. (*Walsh, supra,* 148 Cal.App.4th at p. 1452.) The reviewing court determined that the trial court's order was supported by substantial evidence. (*Id.* at p. 1456.)

*Dunbar v. Albertson's, Inc., supra,* 141 Cal.App.4th 1422, concerned unpaid overtime of grocery store managers. Albertson's defended a motion for class certification by asserting that individual issues predominated. It contended that store operations vary depending upon store size, hours and location. The proportion of time spent on various tasks depends upon the type of departments (florist, photo lab, bakery, Starbucks, butcher shop), the demographic makeup of the community, incidence of criminal activity and management style. (*Id.* at p. 1427.)

The trial court relied on evidence that the work performed by the managers varied significantly from "store to store and week to week," and concluded that individual issues predominated. (*Dunbar v. Albertson's Inc., supra,* 141 Cal.App.4th at p. 1429.) The trial court acknowledged that there were common issues, such as whether stocking shelves and operating cash registers are managerial tasks. However, it indicated that the tasks performed by the managers were so dissimilar that it could not "reasonably extrapolate findings from the named plaintiff to the absent class members." (*Id.* at p. 1430.)

As outlined in *Sav-On,* the trial court is afforded great deference in ruling on a certification order. Our task is to determine whether the record contains substantial evidence to support the trial court's predominance finding. (*Sav-On, supra,* 34 Cal.4th at p. 328.) A single declaration is sufficient to support class treatment because "[e]vidence of even one credible witness 'is sufficient for proof of any fact.' [Citation.]" (*Id.* at p. 334.)

Here, the record contained the declarations of four managers, TM's expert, its vice-president of store operations, and five of TM's attorneys. All asserted in detail the wide disparity in store location, size, configuration, management duties and styles. They also established that managers routinely exercise their independent judgment. In his written ruling, Judge Munoz noted the varying characteristics of the stores and identified matters he believed were susceptible of classwide proof (mandated management policies) and those that were individual inquiries (time spent performing exempt duties and exercising discretion). The court observed that the managers, who filed declarations for the class, were impeached by their deposition testimony. This was a comment on the nature of the evidence, and did not constitute a consideration of the case on the merits, or a determination of witness credibility.

Substantial evidence supports the trial court's conclusion that individualized issues of liability and damages will predominate over issues common to the class if the overtime claims are tried as a class action.

## DISPOSITION

The judgment (order granting decertification) is affirmed. Costs on appeal are awarded to respondent.

Yegan, Acting P. J., and Perren, J., concurred.

Appellants' petition for review by the Supreme Court was denied March 10, 2010, S179436.