[No. B224349. Second Dist., Div. Two. June 7, 2011.]

ROGER WILLIAM SODERSTEDT, JR., et al., Plaintiffs and Appellants, v. CBIZ SOUTHERN CALIFORNIA, LLC, Defendant and Respondent.

**COUNSEL**

Kershaw, Cutter & Ratinoff, William A. Kershaw, Lyle W. Cook and Stuart C. Talley for Plaintiffs and Appellants.

Hunton & Williams, Phillip J. Eskenazi, Jason J. Kim and John H. Dolan for Defendant and Respondent.

OPINION

**DOI TODD, Acting P. J.**—Plaintiffs and appellants Roger William Soderstedt, Jr., and Ruslan Daych appeal from an order denying class certification in the action they filed against their former employer, defendant and respondent CBIZ Southern California, LLC (CBIZ). As putative class representatives, they sought to certify a class of current and former employees assertedly misclassified by CBIZ as exempt from California's overtime laws. The trial court ruled that a class action was not superior in light of the evidence submitted, finding that appellants failed to establish a predominance of common questions of law or fact, numerosity or adequacy.

We affirm. Substantial evidence supported the trial court's ruling that appellants failed to meet their burden to establish the requirements necessary for class certification, and the trial court neither employed improper legal criteria nor made erroneous legal assumptions in reaching this conclusion.

## FACTUAL AND PROCEDURAL BACKGROUND

*The Complaint.*

CBIZ is an accounting and financial services firm with offices in Los Angeles, Oxnard and Bakersfield. Accountants at CBIZ are required to hold an accounting degree and are each classified by one of the following positions: lead managing director, managing director, director, senior manager, manager, supervising senior, senior and associate. The services CBIZ provides include tax, attest and litigation support. Appellant Soderstedt began work as an associate at CBIZ's Oxnard office in September 2005, immediately following his graduation from college. He was promoted to senior associate in January 2007 and left CBIZ in June 2007 after he earned his certified public accountant (CPA) license. Appellant Daych began work as an associate in CBIZ's Oxnard office in July 2006, also immediately following his graduation from college. He was not promoted to senior associate and his employment was terminated in August 2008. Associates at CBIZ were expected and encouraged to work long hours, including more than eight hours per day and 40 hours per week. CBIZ never informed appellants about any policy requiring them to take lunch or rest breaks.

Appellants filed a class action complaint against CBIZ in July 2009, alleging multiple Labor Code violations for CBIZ's failure to pay overtime, provide meal and rest periods, provide itemized employee wage statements and pay wages timely; and a violation of Business and Professions Code section 17200 on the basis of that conduct. They purported to represent at

least 146 other similarly situated current and former CBIZ associates and senior associates.

*The Class Certification Motion.*

*Appellants' Evidence.*

In February 2010, appellants moved for class certification. They defined the class they sought to certify as: "All persons employed by Defendant in California, from January 2005 until the time when class notice may be given, who: (1) assisted certified public accountants in the practice of public accountancy, as provided for in California Business and Professions Code sections 5051 and 5053, (2) worked as associates or senior associates in the assurance or tax lines of service, (3) were not licensed by the State of California as certified public accountants during some or all of this time period, and (4) were classified as exempt employees."

In support of the motion, they offered appellants' declarations which described appellants' job training and responsibilities, and indicated they would represent the interests of the class to the best of their ability. In addition, appellants submitted the declarations of two other proposed class members who discussed the review and supervision of their work. On reply, they offered deposition excerpts, copies of documents produced by CBIZ relating to its internal policies, excerpts of the American Institute of Certified Public Accountants (AICPA) professional standards and evidence of counsel's experience in litigating class actions. They also sought judicial notice of the briefs submitted in connection with the Ninth Circuit appeal in *Campbell v. PricewaterhouseCoopers, LLP* (E.D.Cal. 2008) 253 F.R.D. 586 (*Campbell*).

According to their declarations, appellants gained a general understanding of CBIZ's organization and employment practices from attending a national seminar shortly after they began their employment. They learned that CBIZ's two largest areas of service were assurance and tax, and that accountants who worked in those areas held classifications ranging from director as the most senior to associate as the least senior. Typically, an associate was a recent college graduate with limited accounting experience who had not yet been licensed as a CPA. The position of senior, or senior associate, was held by someone with more accounting experience than an associate, but who typically did not have a CPA license. The positions of manager and director were generally reserved for those holding a CPA license.

Appellants averred that the primary duty of an associate was to prepare tax returns, which was a task subject to a uniform standard procedure, carried out using standardized computer software. Associates were required to document

all work and were expected to seek guidance from a more senior accountant if they were uncertain about any issue on the return. After the tax return was completed, a senior associate would review it and prepare review notes; the associate would make any necessary corrections and return the corrected return to the senior associate for further review. Once corrected, a manager or director would then review the tax return.

During their tenure at CBIZ, appellants and one other declarant also assisted CPA's in the assurance line of business, which included the performance of audits, compilations and reviews, all designed to provide verification of the accuracy of clients' financial statements. Each audit, compilation or review was performed essentially the same way, supervised by a CPA who was responsible for leading an engagement team and directing the team through the use of a plan which would contain a checklist of the necessary procedures. As with tax return preparation, each associate's work would be documented and reviewed by a manager and/or director. Associates and senior associates did not have discretion to deviate from the plan without the prior express approval of the CPA responsible for the assurance work.

CBIZ had adopted written policies concerning personnel management and engagement performance. Pertinent here, it was CBIZ's policy "that all compilation, review, audit, and attestation (including forecast and projection) engagements be properly planned, performed, supervised, reviewed, documented, and communicated in accordance with the requirements of professional standards, regulatory authorities, and the Firm." In connection with this policy, CBIZ issued guidelines for tax return review, which outlined three phases of review. As a public accounting firm, CBIZ was also required to comply with the AICPA professional standards.

*CBIZ's Evidence.*

CBIZ opposed the motion on the grounds that appellants had failed to demonstrate a predominance of common claims, that the representatives' claims were typical of the class or that a class action was superior. In support of its opposition, it submitted 38 declarations from current and former employees, including associates, senior associates, supervising seniors, managers, senior managers, directors and a managing director from different departments in each of CBIZ's three offices. Attached to counsel's declaration, CBIZ also offered appellants' deposition excerpts and employment records, as well as a summary comparison of statements made by appellants and its declarants.

CBIZ sought judicial notice of an order in another matter, Industrial Welfare Commission wage order No. 4-2001, a February 1989 opinion letter from the Division of Labor Standards Enforcement (DLSE) and various

federal and state regulations. CBIZ also submitted evidentiary objections to the evidence appellants offered in support of the motion.

CBIZ's evidence focused on the differences among CBIZ's offices, type of work and levels of supervision. For example, Los Angeles office managing director Chris Krogh averred: "The responsibilities of individuals within each job title vary dramatically based on any number of factors, such as their experience level, the particular engagement, the client, the client's industry, the other accountants with whom they are working and their office." Krogh also described the three CBIZ offices. CBIZ's largest office in Los Angeles employed 55 accountants who worked in the attest, tax or litigation department, each of which had its own client base and client engagements. Though associates were permitted to work in all three departments for the first one to two years of their employment, accountants above associate level generally worked in a single department. Only the Los Angeles office performed audits for public companies, which are conducted according to different standards than other types of audits.

The Bakersfield office employed 43 accountants in either the tax, attest or litigation department. Associates generally worked in either the tax and attest departments, or the litigation department; accountants above that level were required to choose a single department. The Bakersfield office worked for a diverse client base, including nonprofit entities, and was the only CBIZ office to perform work for government clients.

The Oxnard office where appellants had been employed had 21 accountants who were not segregated into departments. The nature of the attest and tax work in that office was driven by the three individual directors who performed that work, and the majority of the work in that office was for clients in the construction industry. Only the Oxnard office employed a "buddy system" to train new associates.

Multiple current and former associates and senior associates averred that they used their accounting knowledge and professional judgment in the course of carrying out their job responsibilities, and that the level of discretion and judgment they used depended on their experience and the nature of the engagement. They explained how each assignment was different, requiring them to utilize their accounting knowledge and judgment, and how their level of supervision decreased and their level of responsibility increased with each further engagement. They described the varying specific tasks involved with each area of engagement, including financial statement review and compilation, tax return preparation, tax research, audits and

consulting work. Associates gave specific examples of engagements in which they regularly interfaced directly with clients and answered questions that fell within the scope of their professional knowledge. Senior associates and some associates were charged with reviewing the work of other associates. Both associates and senior associates declared that they exercised discretion in setting their schedules and in managing their workloads so as to prioritize tasks and meet various deadlines.

Managers and directors averred that they assigned different types of work to associates and senior associates based on myriad factors, such as the individual's knowledge and abilities, which included his or her professional judgment, experience and skill level; the nature of the client; and the complexity of the assignment. Directors described the different job responsibilities associated with each area of engagement, as well as the difference in responsibilities in each office for similar engagements. Because associates and senior associates tended to perform at different levels, managers and directors would provide different levels of supervision and review depending on the level of guidance and feedback required. Similarly, the level of client contact permitted varied among individual associates and senior associates on the basis of their ability and experience.

*Denial of Class Certification.*

At an April 27, 2010 hearing, the trial court denied the motion on the ground that the requisite elements for class certification were not present. More particularly, the trial court ruled that there was no competent evidence of numerosity; the representatives' declarations were insufficient to show adequacy of representation; while common issues existed, they did not predominate; and class treatment would not be superior.

This appeal followed.

## DISCUSSION

Appellants contend that the trial court's ruling denying class certification was unsupported by either the law or the evidence. For the reasons discussed below, we find no merit to their contentions.

I. *General Class Action Principles and Standard of Review.*

■ Code of Civil Procedure section 382 authorizes a class action "when the question is one of a common or general interest, of many persons, or

when the parties are numerous, and it is impracticable to bring them all before the court . . . ." As explained in *Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326 [17 Cal.Rptr.3d 906, 96 P.3d 194] (*Sav-On*), "[t]he party seeking certification has the burden to establish the existence of both an ascertainable class and a well-defined community of interest among class members. [Citation.] The 'community of interest' requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class. [Citation.]" (Accord, *Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal.4th 1096, 1104 [131 Cal.Rptr.2d 1, 63 P.3d 913].)

To establish these factors, the party seeking certification must show "that questions of law or fact common to the class predominate over the questions affecting the individual members (hereafter sometimes referred to as predominance). [Citation.] In essence, this means 'each member must not be required to individually litigate numerous and substantial questions to determine his [or her] right to recover following the class judgment; and the issues which may be jointly tried, when compared with those requiring separate adjudication, must be sufficiently numerous and substantial to make the class action advantageous to the judicial process and to the litigants.' [Citation.] A class action should be certified only if it will provide substantial benefits both to the courts and the litigants. [Citations.]" (*Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 913–914 [103 Cal.Rptr.2d 320, 15 P.3d 1071].)

The decision to certify a class rests with the sound discretion of the trial court. "Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification." (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435 [97 Cal.Rptr.2d 179, 2 P.3d 27].) Moreover, where the decision turns on disputed facts or inferences to be drawn from the facts, the appellate court cannot substitute its decision for that of the trial court. (*Sav-On, supra,* 34 Cal.4th at p. 328.) If supported by substantial evidence, the trial court's ruling will not be disturbed unless improper criteria were used or erroneous legal assumptions were made. (*Id.* at p. 327.) Under this standard, "we must examine the trial court's reasons for denying class certification," keeping in mind that " '[a]ny valid pertinent reason stated will be sufficient to uphold the order.' " (*Linder v. Thrifty Oil Co., supra,* at p. 436.)

II. *The Trial Court Properly Exercised Its Discretion in Denying Class Certification.*

The trial court ruled that the community of interest requirement was not satisfied, specifically finding that appellants failed to meet their burden to

establish its three elements. After considering the pleadings, evidence and arguments of counsel, the trial court issued its order denying appellants' motion for class certification, ruling: "1) Plaintiffs failed to establish the numerosity requirement through admissible evidence; [¶] 2) Plaintiffs failed to establish that they are adequate class representatives through admissible evidence; [¶] 3) Plaintiffs failed to establish a predominance of common questions of law or fact; and [¶] 4) Plaintiffs failed to establish the superiority requirement. The Court specifically finds that a class action is not superior in this case in light of the evidence submitted and the issues involved." We examine each finding in turn.

### A. Substantial Evidence Supported the Finding That Common Issues of Law or Fact Did Not Predominate.

■ " 'A class may be certified when common questions of law and fact predominate over individualized questions. . . . [T]o determine whether common questions of fact predominate the trial court must examine the issues framed by the pleadings and the law applicable to the causes of action alleged.' [Citation.]" (*Ali v. U.S.A. Cab Ltd.* (2009) 176 Cal.App.4th 1333, 1347 [98 Cal.Rptr.3d 568].) We consider appellants' legal theory of liability as well as CBIZ's affirmative defenses, "because a defendant may defeat class certification by showing that an affirmative defense would raise issues specific to each potential class member and that the issues presented by that defense predominate over common issues. [Citations.]" (*Walsh v. IKON Office Solutions, Inc.* (2007) 148 Cal.App.4th 1440, 1450 [56 Cal.Rptr.3d 534].) We examine whether substantial evidence supported the trial court's finding on predominance and draw inferences from the evidence in favor of the order. (*Sav-On, supra,* 34 Cal.4th at p. 328.)

### 1. The administrative exemption.

■ Appellants alleged that CBIZ violated multiple Labor Code provisions as to the proposed class of associates and senior associates by failing to pay overtime for work in excess of eight hours in one day and 40 hours in one week (Lab. Code, § 510), failing to provide an itemized wage statement (Lab. Code, § 226) and failing to provide meal periods and rest breaks (Lab. Code, §§ 226.7, 512). "The Industrial Welfare Commission (IWC), however, is statutorily authorized to 'establish exemptions from the requirement that an overtime rate of compensation be paid . . . for executive, administrative, and professional employees, provided [inter alia] that the employee is primarily engaged in duties that meet the test of the exemption, [and] customarily and regularly exercises discretion and independent judgment in performing those

duties . . . .' ([Lab. Code], § 515, subd. (a).)" (*Sav-On, supra*, 34 Cal.4th at p. 324; see also *Combs v. Skyriver Communications, Inc.* (2008) 159 Cal.App.4th 1242, 1253 [72 Cal.Rptr.3d 171] (*Combs*) [the Lab. Code "grants the IWC a broad mandate to regulate the working conditions of employees in California, including the setting of standards for minimum wages and maximum hours"].)[1]

Consistent with its mandate, "the IWC has promulgated 17 different wage orders that apply to distinct groups of employees. [Citation.]" (*Combs, supra*, 159 Cal.App.4th at p. 1253.) Pertinent here, effective January 1, 2001, the IWC (Industrial Welfare Commission) issued wage order No. 4-2001, applicable to professional, technical, clerical and other similar occupations. (*Combs*, at p. 1253.) Codified in title 8, section 11040 of the California Code of Regulations provides that portions of wage order No. 4-2001—including provisions relating to overtime pay, meal and rest periods and wage statements—do not apply to "persons employed in administrative, executive, or professional capacities." (Cal. Code Regs, tit. 8, § 11040, subd. (1)(A); see also *United Parcel Service Wage & Hour Cases* (2010) 190 Cal.App.4th 1001, 1010 [118 Cal.Rptr.3d 834] [describing the same exemption applicable to transportation industry workers codified in Cal. Code Regs., tit. 8, § 11090, subd. 1(A)].)

For the administrative exemption to apply, an employee must meet several requirements: "A person employed in an administrative capacity means any employee: [¶] (a) Whose duties and responsibilities involve either: [¶] (I) The performance of office or non-manual work directly related to management policies or general business operations of his/her employer or his employer's customers; . . . [¶] (b) Who customarily and regularly exercises discretion and independent judgment; and [¶] (c) Who regularly and directly assists a proprietor, or an employee employed in a bona fide executive or administrative capacity (as such terms are defined for purposes of this section); or [¶] (d) Who performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge; or [¶] (e) Who executes under only general supervision special assignments and tasks; and [¶] (f) Who is primarily engaged in duties that meet the test of the exemption. The activities constituting exempt work and non-exempt work

---

[1] " 'The IWC, established by the Legislature in 1913, was the state agency authorized to formulate the regulations, or wage orders, that govern employment in California. [Citation.] In fulfilling its broad statutory mandate to regulate wages, hours, and working conditions of California employees, the IWC acted in a quasi-legislative capacity. [Citation.] Although the IWC was defunded effective July 1, 2004, its wage orders remain in effect. [Citation.]' [Citation.]" (*California Correctional Peace Officers' Assn. v. State of California* (2010) 188 Cal.App.4th 646, 651 [115 Cal.Rptr.3d 361].)

shall be construed in the same manner as such terms are construed in the following regulations under the Fair Labor Standards Act effective as of the date of this order: 29 C.F.R. Sections 541.201–205, 541.207–208, 541.210, and 541.215. Exempt work shall include, for example, all work that is directly and closely related to exempt work and work which is properly viewed as a means for carrying out exempt functions. The work actually performed by the employee during the course of the workweek must, first and foremost, be examined and the amount of time the employee spends on such work, together with the employer's realistic expectations and the realistic requirements of the job, shall be considered in determining whether the employee satisfies this requirement. [¶] (g) Such employee must also earn a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment. Full-time employment is defined in California Labor Code Section 515(c) as 40 hours per week." (Cal. Code Regs., tit. 8, § 11040, subd. 1(A)(2); see also *Combs, supra*, 159 Cal.App.4th at p. 1254.)

### 2. *Application of the administrative exemption turned on individualized questions.*

Although the trial court's written order denying class certification—which appellants' counsel prepared—did not mention the administrative exemption, it was the focus of commonality discussion at the hearing. Concluding that the application of the administrative exemption defeated any finding of predominance of common issues, the trial court emphasized the differences in job responsibilities among associates and senior associates in CBIZ's three offices: "[C]lass action is not appropriate when you have multiple, perhaps as many as 146 mini trials. The defendant submits evidence that each of the three Southern California offices have different clients, different client responsibilities, different tasks vis-à-vis the accountants who are employed by the defendant, different assignments are meted out and handled [*sic*] out, different client responsibilities result therefrom."

■ Differences like those enumerated by the trial court led the court in *Mekhitarian v. Deloitte & Touche (ICS), LLC* (C.D.Cal., Nov. 3, 2009, No. CV 07-412 DSF (MANx)) 2009 WL 6057248 (*Mekhitarian*) to deny certification of a proposed class of tax associates and tax seniors classified as exempt employees.[2] The court ruled that application of the administrative exemption could not be determined with common evidence where the defendants demonstrated that tax associates and tax seniors "engage in

---

[2] For guidance in class certification matters, California courts may look to the Federal Rules of Civil Procedure, rule 23 (28 U.S.C.), and case law interpreting that provision. (*Janik v. Rudy, Exelrod & Zieff* (2004) 119 Cal.App.4th 930, 943 [14 Cal.Rptr.3d 751].)

varying duties depending on their personal level of aptitude and experience as well as the types of clients that they serve and the supervisors that they work for," the evidence indicated "that they had significantly different experiences while working for Defendants," and they "engaged in a wide variety of tasks of varying complexity." (*Mekhitarian*, at pp. *2, *4, *5.) Similarly, the court in *Nguyen v. BDO Seidman, LLP* (C.D.Cal., July 6, 2009, No. SACV 07-01352-JVS (MLGx)) 2009 WL 7742532, page *2 (*Nguyen*) rejected the plaintiffs' position that the issue of whether the defendant accounting firm had misclassified its unlicensed associates as exempt employees presented a common and predominating question justifying class treatment. The court reasoned that the applicability of each element of the administrative exemption required an individualized inquiry. (*Id.* at p. *5; see also *id.* at p. *3, fn. 8 ["the administrative and professional exemptions are common defenses, but their resolution turns on individual questions . . ."].) For example, in explaining why an individualized inquiry was required to resolve the question of whether unlicensed associates regularly exercised discretion and independent judgment, the court cited declarations showing that "putative class members are expected to evaluate 'grey areas' when preparing tax returns [citations], use their judgment and discretion when researching and analyzing tax issues for clients [citations], and assume additional responsibility based on a number of factors [citations]." (*Id.* at p. *5.)

Consistent with these authorities, courts have denied motions for class certification in cases involving application of an administrative exemption to classes of employees other than accountants. (*Rix v. Lockheed Martin Corp.* (S.D.Cal., Mar. 14, 2011, No. 09-CV-2063 MMA (NLS)) 2011 WL 890744, pp. *5–*8 [no predominance of common questions where resolution of whether industry security representatives qualified as exempt under wage order No. 4-2001's administrative exemption involved individualized inquiries as to what tasks each representative performed]; *Perry v. U.S. Bank* (N.D.Cal., Oct. 16, 2001, No. C-00-1799-PJH) 2001 WL 34920473, p. *7 [no predominance of common questions where the defendant bank's declarations showed differences in individual job duties of putative class of personal bankers and separate detailed, fact-specific determinations would be required to determine exempt status under IWC wage orders]; see also *Beauperthuy v. 24 Hour Fitness USA, Inc.* (N.D.Cal., Feb. 24, 2011, No. 06-715 SC) 2011 WL 750409, p. *16 ["Where, as here, significant differences exist among the job duties of the putative class members (even for managers with the same job title), a determination whether class members qualify for FLSA [(Fair Labor Standards Act)] overtime exemptions will necessitate an individualized inquiry into the circumstances of each Plaintiff."]; *Trinh v. JP Morgan Chase & Co.* (S.D.Cal., Apr. 22, 2008, No. 07-CV-1666 W(WMC)) 2008 WL 1860161,

p. *4 [no showing of common proof where question of "whether or not an employee is 'exempt' under relevant labor laws involves an analysis of each individual loan officer's daily duties and compensation and whether they meet several statutory and administrative exemptions"].)

Here, too, the evidence showed that the applicability of the administrative exemption would require individualized inquiries to determine whether its elements were satisfied. (*United Parcel Service Wage & Hour Cases, supra,* 190 Cal.App.4th at p. 1028 [evaluation of whether the elements of the administrative exemption have been established requires a fact-intensive inquiry, including an examination of the actual work performed by the employee].)

Addressing the disputed elements of the administrative exemption, the evidence showed individual differences in whether associates and senior associates perform nonmanual work directly related to management policies or general business operations. (Cal. Code Regs., tit. 8, § 11040, subd. 1(A)(2).) In *Ho v. Ernst & Young LLP* (N.D.Cal., Mar. 4, 2008, No. C 05-04867 JF) 2008 WL 619029, pages *2–*3 (*Ho I*), the court found this element satisfied by evidence showing that a tax associate researched tax issues, explained complex tax issues to clients lacking his tax expertise and was the primary contact for several clients. (See also *Nguyen, supra,* 2009 WL 7742532 at p. *5 [individualized inquiry required where evidence showed that some putative class members developed recommendations for high-level tax advice, worked on securities filings and audited clients' books and internal processes].) The declarations offered by CBIZ showed that at least some associates and senior associates had job responsibilities similar to the tax associate in *Ho I*; they undertook various tax research assignments, performed audits, identified complex tax issues and applied distinct tax treatments for various types of clients and served as primary client contacts. Further demonstrating work related to general business operations, some senior associates served as "technology champions" for their offices, requiring them to obtain and provide information about tax return software updates.

■ The evidence likewise showed that associates and senior associates regularly exercised varying levels of discretion and independent judgment, depending on a number of factors including their level of experience and the nature of the engagement. Indeed, CBIZ managers and directors expected associates and senior associates to exercise their discretion and professional judgment as they performed their job duties. An exercise of discretion is not synonymous with an absence of review. " 'The fact that an employee's decisions may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment.' [Citations.]" (*Palacio v. Progressive Ins. Co.* (C.D.Cal. 2002) 244 F.Supp.2d 1040, 1048.)

Finally, the evidence established that the level of general supervision provided to associates and senior associates varied depending on the individuals involved and the type of engagement, as well as the location of the CBIZ office. (See also *Nguyen, supra*, 2009 WL 7742532 at p. *6 [individualized inquiry required where the defendant offered "evidence that the amount of supervision given to putative class members in this case varies widely depending on factors such as the particular engagement, the partner or manager in charge, and the individual employee's capabilities"].)

■ "Our task is to determine whether the record contains substantial evidence to support the trial court's predominance finding." (*Keller v. Tuesday Morning, Inc.* (2009) 179 Cal.App.4th 1389, 1399 [102 Cal.Rptr.3d 498].) Substantial evidence supported the trial court's finding that common questions did not predominate because of the individualized inquiries necessary to determine application of the administrative exemption.

3. *The trial court did not employ improper criteria or make erroneous legal assumptions.*

Appellants contend that—notwithstanding the presence of substantial evidence—the trial court's reasoning is flawed for several reasons. (See *Caro v. Procter & Gamble Co.* (1993) 18 Cal.App.4th 644, 655 [22 Cal.Rptr.2d 419] ["Erroneous legal assumptions or improper criteria may require reversal 'even though there may be substantial evidence to support the court's order.' "].) We find no error.

Citing the trial court's comments at the hearing, appellants first argue that the court improperly relied on a federal regulation that was not intended to assist in construing wage order No. 4-2001. In finding no predominance, the trial court stated: "29 C.F.R. section 541.201(b) makes it clear that management for general business operations do [*sic*] include tax, finance, and accounting positions, and that's subsumed under Wage Order No. 4-2001(2)(f) as an administrative exemption, which I find applies in this case, therefore, defeating certification on the commonality factor." It was referring to the current version of the regulation, which explains that the wage order phrase "directly related to management or general business operations" "includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities." (29 C.F.R. § 541.201, subd. (b) (2011).)

As explained in *Combs, supra*, 159 Cal.App.4th at pages 1254–1255: "[W]age Order No. 4-2001 expressly incorporates certain FLSA [(Fair Labor Standards Act)] regulations effective as of the date that wage order was issued. Specifically, California Code of Regulations, title 8, section 11040, subdivision 1(A)(2)(f) provides in part: 'The activities constituting exempt work and non-exempt work shall be construed in the same manner as such terms are construed in the following regulations under the [FLSA] effective as of the date of this order: 29 [Code of Federal Regulations 541.201–205, 541.207–208, 541.210, and 541.215.' " The language on which the trial court relied, specifically identifying accountants as practicing within a functional area that is directly related to general business operations, was enacted as part of the 2004 revisions to the federal regulations, and was not a part of the regulations at the time wage order No. 4-2001 was issued. (See 69 Fed.Reg. 22122, 22125 (Apr. 23, 2004); see also *Campbell, supra*, 253 F.R.D. at p. 598, fn. 9.) Appellants therefore contend that the trial court made an erroneous legal assumption by relying on a federal regulation that was not expressly incorporated into wage order No. 4-2001.

█ The purpose of the 2004 revisions, however, was to "simplify, clarify and better organize the regulations defining and delimiting the exemptions for administrative, executive and professional employees." (69 Fed.Reg. 22122, 22125 (Apr. 23, 2004).) Rejecting the argument that the revisions improperly broadened any exemption, the Department of Labor stated that "the final rule will enhance understanding of the boundaries and demarcations of the exemptions Congress created." (*Ibid.*) With respect to the addition of the functional areas to which the administrative exemption would apply, the Department of Labor added that the list was intended to be illustrative and did not amount to a substantive change. (69 Fed.Reg. 22122, 22142–22143.) Adopting this reasoning, the *Combs* court characterized the list of functional areas adopted in the 2004 revisions as "additional interpretive guidance" in construing the administrative exemption. (*Combs, supra*, 159 Cal.App.4th at p. 1256; see also *Heffelfinger v. Electronic Data Systems Corp.* (C.D.Cal. 2008) 580 F.Supp.2d 933, 950, fn. 77 [observing that *Combs*'s reliance on the new regulations was "supported by the preamble to the amended regulations as proposed, in that it stated that the amendments were not meant to effect any substantive change in the exemptions"].) Accordingly, the trial court did not err by relying on the revised federal regulations in interpreting the administrative exemption in wage order No. 4-2001.

Appellants next contend that the trial court committed legal error because accountants, as a matter of law, do not qualify for the administrative exemption. Their position finds no support in the law. (See *Nguyen, supra*, 2009 WL 7742532 at pp. *5–*7 [individualized questions governed evaluation of application of administrative exemption to tax associates]; *Ho v. Ernst & Young LLP* (N.D.Cal., Jan. 15, 2009, No. C 05-4867 JF (HRL)) 2009 WL

111729, p. *3 (*Ho II*) [concluding entry-level accountant performed office work directly related to Ernst & Young's business operations]; *Ho I, supra*, 2008 WL 619029 at p. *1 [granting summary judgment on the ground that accountant was administratively exempt, where accountant held an "above entry-level position [that] requires the employee to review and analyze client data, identify and research tax issues arising from client situations, conduct legal research and analysis, respond to client questions, and develop client relationships"]; see also *Campbell, supra*, 253 F.R.D. at pp. 598–599 [noting that unlicensed tax associates may qualify for the administrative exemption].)

■ Third, appellants assert that the "general supervision" requirement in wage order No. 4-2001 is incompatible with Business and Professions Code section 5053, which requires "control and supervision" of unlicensed employees and with a similar directive in the AICPA professional standards. But courts have not found the statutory and professional standards to impose any type of supervision that is inconsistent with the administrative exemption; nor have they concluded that those standards operate to preclude an individualized inquiry into the level of supervision provided to accountants. (See *Nguyen, supra*, 2009 WL 7742532 at p. *6 & fn. 19 [evidence showed that level of supervision provided varied among putative class members based on a number of factors; even the plaintiff's "expert conceded that the supervision determination under 5053 'really does come down to a fact-and-circumstances analysis' "]; *Ho II, supra*, 2009 WL 111729 at pp. *3–*4 [finding a triable issue of fact as to the level of "general supervision" provided to an entry level accountant]; see also *Campbell, supra*, 253 F.R.D. at p. 601 ["These rules [(Bus. & Prof. Code, § 5053 and AICPA std. § 311.11)] envision, however, that the amount of supervision that is appropriate varies on an individual basis."].) Implicitly rejecting the same argument that appellants make here, the *Mekhitarian* court stated: "There is no support for Plaintiffs' overly broad claim that mere review and approval of the class members' work is sufficient to take them outside of the administrative exemption. Virtually every employee—no matter how high ranking—is subject to some degree of supervision by a superior. It is the degree of supervision that is key, and the degree of supervision of class members cannot be determined on common proof because the evidence indicates that they had significantly different experiences while working for Defendants." (*Mekhitarian, supra*, 2009 WL 6057248 at p. *4.)

■ Fourth, appellants contend that the trial court erred when it resolved the issue of the application of the administrative exemption on the merits. Again, appellants isolate part of the trial court's comments at the hearing when the court described the administrative exemption, adding, "which I find applies in this case, therefore, defeating certification on the commonality factor." When read in context, it is apparent that the trial court was emphasizing that the availability of the administrative exemption defense would

involve individualized inquiries in view of the evidence showing the associates' and senior associates' different tasks and responsibilities. The trial court's conclusion that the administrative exemption defense was available to CBIZ involved nothing more than the consideration of a threshold legal issue—a practice common and often necessary in class certification decisions. (See, e.g., *Fireside Bank v. Superior Court* (2007) 40 Cal.4th 1069, 1092 [56 Cal.Rptr.3d 861, 155 P.3d 268] [" 'whether the claims or defenses of the representative plaintiffs are typical of class claims or defenses' was an issue that might necessarily be intertwined with the merits of the case, but which a court considering certification necessarily could and should consider"]; *Walsh v. IKON Office Solutions, Inc., supra*, 148 Cal.App.4th at p. 1450 ["The affirmative defenses of the defendant must also be considered, because a defendant may defeat class certification by showing that an affirmative defense would raise issues specific to each potential class member and that the issues presented by that defense predominate over common issues."].)

Finally, appellants assert that the trial court failed to consider their theory of recovery in concluding that common issues did not predominate. (See *Sav-On, supra*, 34 Cal.4th at p. 327 ["in determining whether there is substantial evidence to support a trial court's certification order, we consider whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment"].) According to their theory, the determination of whether appellants have been misclassified as exempt employees can be made by common proof, because the question can be resolved by evaluating CBIZ's policies and procedures. In other words, whether or not associates and senior associates are subject to varying levels of supervision or whether they exercise more or less discretion on any given engagement fails to raise individualized questions because those determinations arise from the application of a policy that can be gleaned from common proof.

 Notably, the case on which appellants rely most heavily rejected this approach. In *Campbell, supra*, 253 F.R.D. at page 590, the court certified a limited class of accounting associates in the defendant's attest division. In evaluating whether certification would be appropriate for a larger class of employees, the court explained that it was required to look at both the employer's realistic expectations derived from statutes, professional standards and internal policies on the one hand, and how each employee spends his or her time on the other. (*Id.* at p. 600, citing *Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 802 [85 Cal.Rptr.2d 844, 978 P.2d 2].) Thus, even though the employer's expectations were predominately uniform in nature, the court considered evidence pertaining to the job duties actually performed by each employee. (*Campbell, supra*, at p. 603 ["The fact that an employer classifies all or most of a particular class of employees as exempt does not eliminate the need to make a factual determination as to whether class

members are actually performing similar duties."].) On the basis of declarations offered by the defendant outlining varying degrees and types of responsibility among employees, the court declined to include in the class employees outside the attest division, finding "significant differences in the work performed between divisions and between lines of services." (*Id.* at p. 604.) It also found "a meaningful distinction between associates and senior associates' duties." (*Ibid.*)

Other courts have routinely concluded that an individualized inquiry is necessary even where the alleged misclassification involves application of a uniform policy, because the policy may properly classify some employees as exempt but not others. (E.g., *Arenas v. El Torito Restaurants, Inc.* (2010) 183 Cal.App.4th 723, 734 [108 Cal.Rptr.3d 15] [theory of recovery that managers were misclassified on the basis of their job descriptions not amenable to common proof where evidence showed that managers' duties and time spent on individual tasks varied significantly from one restaurant to another]; *Ali v. U.S.A. Cab Ltd., supra,* 176 Cal.App.4th at p. 1350 ["Although the leases and training manuals are uniform, the court reasonably found the testimony of putative class members would be required on the issues of employment and fact of damage."]; *Dunbar v. Albertson's, Inc.* (2006) 141 Cal.App.4th 1422, 1427 [47 Cal.Rptr.3d 83] [evidence of a standardized or uniform policy or practice to classify employees as exempt did not compel class certification, as "that single policy decision may be improper as to some putative class members but proper as to others"]; see also *Vinole v. Countrywide Home Loans, Inc.* (9th Cir. 2009) 571 F.3d 935, 946 ["we hold that a district court abuses its discretion in relying on an internal uniform exemption policy to the near exclusion of other factors relevant to the predominance inquiry"; "focusing on a uniform exemption policy alone does little to further the purpose of Rule 23(b)(3)'s predominance inquiry . . ."]; *Marlo v. United Parcel Service, Inc.* (C.D.Cal. 2008) 251 F.R.D. 476, 484 ["a class-wide determination of misclassification generally cannot be proved from the existence of an exemption policy alone"].)

Appellants' authorities are not to the contrary, as appellants cited cases where any individualized inquiry was pertinent to damages only. (See *Jaimez v. Daiohs USA, Inc.* (2010) 181 Cal.App.4th 1286, 1301–1304 [105 Cal.Rptr.3d 443] [common issues predominated where the issue involved the employer's practice to deny overtime and meal and rest breaks, and the extent of the denial was relevant to individual damages]; *Ghazaryan v. Diva Limousine, Ltd.* (2008) 169 Cal.App.4th 1524, 1534–1535 [87 Cal.Rptr.3d 518] [common issues predominated where reasonableness of the defendant's policy on "gap time" was the key issue and individual drivers' use of that time was relevant to damages].)

■ "A court may properly deny certification where there are diverse factual issues to be resolved even though there may also be many common questions of law." (*Evans v. Lasco Bathware, Inc.* (2009) 178 Cal.App.4th 1417, 1427 [101 Cal.Rptr.3d 354].) Here, although CBIZ maintained uniform internal policies and was subject to professional standards, the evidence showed that the manner in which those policies and standards were implemented as to each associate or senior associate varied depending on multiple factors. Accordingly, the trial court neither employed improper criteria nor made erroneous legal assumptions, and we conclude that substantial evidence showed common issues did not predominate.

B. *Substantial Evidence Supported the Findings That Appellants Did Not Establish Numerosity or Adequacy of Representation.*

1. *Numerosity.*

In its order denying class certification, the trial court found that appellants failed to show numerosity through admissible evidence. At the hearing, the trial court commented that although appellants' moving papers identified a class of 146 members, "[a]bsolutely no evidence was submitted by way of declarations, exhibits, defendant's admissions or anything else. As far as I can tell, the class consists of the two or three accountants who filed their declarations, but there's no competent evidence of numerosity."

■ A party seeking class certification bears the burden of satisfying the requirements of Code of Civil Procedure section 382, including numerosity, and the trial court is entitled to consider "the totality of the evidence in making [the] determination" of whether a "plaintiff has presented substantial evidence of the class action requisites . . . ." (*Quacchia v. DaimlerChrysler Corp.* (2004) 122 Cal.App.4th 1442, 1448 [19 Cal.Rptr.3d 508].) Here, the trial court accurately observed that appellants proffered no evidence to support their allegation that there were 146 putative class members. Neither Soderstedt's nor Daych's declaration identified the number of allegedly misclassified associates and senior associates. Likewise, counsel's declaration failed to identify any number of putative class members or even to represent that the members were sufficiently numerous so as to warrant class action treatment.

Implicitly acknowledging this evidentiary deficiency, appellants contend that the number was sufficiently identified by CBIZ in its removal petition, where it noted that approximately 147 current and former CBIZ employees fit the description of the putative class identified in the complaint. But pleadings are allegations, not evidence, and do not suffice to satisfy a party's evidentiary burden. (*San Diego Police Officers Assn. v. City of San Diego* (1994) 29

Cal.App.4th 1736, 1744 [35 Cal.Rptr.2d 253].) Nor did Krogh's declaration constitute evidence of numerosity. He declared that there were a total of 119 accountants employed in CBIZ's three offices, but did not specify how many of those accountants were associates and senior associates. Nor did he make any effort to identify how many former CBIZ employees would fit the putative class description contained in appellants' complaint. (See *Stuart v. Radioshack Corp.* (N.D.Cal., Feb. 5, 2009, No. C-07-4499 EMC) 2009 WL 281941, p. *5 [the defendant's agreement not to contest numerosity "is not enough to establish the numerosity requirement. There must be some evidence supporting such."].)

In the absence of any evidence offered by appellants to support their allegation that there were 146 putative class members, the trial court properly concluded that appellants failed to meet their burden to show numerosity.

### 2. *Adequacy.*

The trial court also found that appellants failed to meet their burden through admissible evidence to show that they were adequate class representatives. At the hearing, the trial court reasoned that appellants' declarations failed to indicate that appellants had any desire to represent the putative class. The trial court continued: "There's no statement that they [(appellants)] understand the obligations of being an adequate class representative, nor have they provided any details of what they've done, what they will do to demonstrate the adequacy of their representation, and the substantial burden that they will be undertaking in order to represent the putative class in this case." The trial court acknowledged that appellants' counsel offered evidence of class action experience, but expressed concern that "the failure to present competent evidence of adequacy and numerosity does suggest to me that perhaps there's not enough attention being paid to this particular putative class action."

■ "The party seeking class certification has the burden of proving the adequacy of its representation." (*Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 470 [174 Cal.Rptr. 515, 629 P.2d 23].) To meet their burden, appellants each declared verbatim: "I have been actively involved in this litigation for its entire duration. I am regularly in contact with my counsel. I have assisted counsel in responding to discovery requests. I understand that as a Class Representative, I must assist counsel in prosecuting the action on behalf of the Class. I have made myself available to date, and will continue to do so and to represent the interests of absent class members to the best of my ability."

■ Although it may have been reasonable on the basis of these averments for the trial court to have concluded that appellants would adequately

represent the interests of the absent class members, that does not mean the trial court's contrary conclusion was necessarily unreasonable. As explained in *Earley v. Superior Court* (2000) 79 Cal.App.4th 1420, 1434 [95 Cal.Rptr.2d 57]: "A class action is a representative action in which the class representatives assume a fiduciary responsibility to prosecute the action on behalf of the absent parties. [Citation.] The representative parties not only make the decision to bring the case in the first place, but even after class certification and notice, they are the ones responsible for trying the case, appearing in court, and working with class counsel on behalf of absent members." It would have been reasonable for the trial court to construe appellants' declarations as falling short of establishing their willingness to act as fiduciaries for absent class members, to the extent that the declarations showed that appellants intended to do nothing beyond what any litigant would do in prosecuting an action on his or her own behalf.

In short, we decline appellants' invitation to reinterpret appellants' declarations to find that the element of adequacy was satisfied. (E.g., *Massachusetts Mutual Life Ins. Co. v. Superior Court* (2002) 97 Cal.App.4th 1282, 1287 [119 Cal.Rptr.2d 190] ["Where a certification order turns on inferences to be drawn from the facts, ' "the reviewing court has no authority to substitute its decision for that of the trial court." ' "].) Substantial evidence supported the trial court's finding that appellants failed to meet their burden to show they were adequate class representatives.

###### C. *Substantial Evidence Supported the Finding That Class Treatment Was Not a Superior Means of Resolving the Matter.*

Finally, the trial court ruled that in view of its other findings, a class action would not be a superior method of adjudication. The trial court did not elaborate on this finding at the hearing except to state that its determination was premised on its other findings regarding the lack of numerosity, adequacy of representation and predominance of common issues.

As with the foregoing factors, the proponent of class certification bears the burden of establishing that a class action will be a superior means of resolving the dispute. (*City of San Jose v. Superior Court* (1974) 12 Cal.3d 447, 460 [115 Cal.Rptr. 797, 525 P.2d 701]; *Newell v. State Farm General Ins. Co.* (2004) 118 Cal.App.4th 1094, 1101 [13 Cal.Rptr.3d 343].) In determining the superiority of class treatment, the trial court must weigh the respective benefits and burdens of class litigation; maintenance of the class action will only be permitted where substantial benefits accrue to both the litigants and the court. (*Linder v. Thrifty Oil Co., supra,* 23 Cal.4th at p. 435; see also *Dean Witter Reynolds, Inc. v. Superior Court* (1989) 211 Cal.App.3d 758, 773 [259 Cal.Rptr. 789] ["This 'superiority' criterion has been held to be 'manifest' in the . . . requirement that the class mechanism confer 'substantial benefits.' "].)

Appellants rely on generalized principles relating to wage and hour claims in arguing that class treatment would be superior. (See *Bufil v. Dollar Financial Group, Inc.* (2008) 162 Cal.App.4th 1193, 1208 [76 Cal.Rptr.3d 804] ["Courts regularly certify class actions to resolve wage and hour claims" because "the class action mechanism allows claims of many individuals to be resolved at the same time, eliminates the possibility of repetitious litigation and affords small claimants with a method of obtaining redress for claims which otherwise would be too insignificant to warrant individual litigation"].) But as our Supreme Court has recognized, "[n]ot all overtime cases will necessarily lend themselves to class actions," "[n]or in every case will class action or arbitration be demonstrably superior to individual actions." (*Gentry v. Superior Court* (2007) 42 Cal.4th 443, 462 [64 Cal.Rptr.3d 773, 165 P.3d 556].)

Substantial evidence supported the trial court's conclusion that a class action was not superior in light of the evidence demonstrating that no substantial benefit would be conferred on either the parties or the court by a class action. These circumstances are akin to those in *Nguyen, supra,* 2009 WL 7742532 at page *8, where the court determined that class treatment was not a superior means of adjudication. In addition to finding that the plaintiff and the putative class members were well-paid employees seeking damages in amounts that would provide them with sufficient monetary incentive to pursue their individual claims, the court reasoned that "this class action would be unmanageable given the predominance of the individual issues necessary to establish BDO's liability for each of the putative class members. Because the adjudication of claims on a classwide basis would amount to the adjudication of each of the claims on an individual basis, effectively, the Court finds that the class action would be unmanageable." (*Ibid.*; see *Dean Witter Reynolds, Inc. v. Superior Court, supra,* 211 Cal.App.3d at p. 773 [citing Fed. Rules Civ.Proc., rule 23 (28 U.S.C.) in evaluating superiority criterion].)

Similarly, the trial court here commented that the individualized inquiries necessary to determine the applicability of the administrative exemption could result in "as many as 146 mini-trials," thereby rendering any class action unmanageable. (See *Arenas v. El Torito Restaurants, Inc., supra,* 183 Cal.App.4th 730, 731 [substantial evidence showed class action not superior where the evidence demonstrated "that resolution of the common issues would require mini-trials inquiring into the circumstances of each individual's job duties"].) Substantial evidence likewise established that class treatment was not superior in this action.

## DISPOSITION

The order denying class certification is affirmed. CBIZ is entitled to its costs on appeal.

Ashmann-Gerst, J., and Chavez, J., concurred.