Filed 6/26/13  Vuong v. Wells Fargo Bank CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| KATHY VUONG et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>WELLS FARGO BANK, N.A.,<br><br>Defendant and Respondent. | A135353<br><br>(City & County of San Francisco<br>Super. Ct. No. CGC-08-480756) |

Kathy Vuong and Stacey Fleming, former employees of defendant Wells Fargo Bank, N.A. who worked in the Service Manager Two (SM2) classification, filed a putative class action, on behalf of themselves and others similarly situated, alleging defendant had misclassified them as employees exempt from California's overtime pay requirements and that, as a result of this misclassification, defendant was liable for violation of various provisions of the Labor Code and the Business and Professions Code. They also asserted violations of meal and rest break laws.  They appeal from the order of the trial court denying their motion for class certification and seek reversal of that order, contending that the court erred in determining that common questions of fact were not predominant in the case.  We discern no error and affirm the order.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I. Background

Defendant operates nearly 1,000 bank branches, or "stores," in California.  Some stores are stand-alone bank branches, while others are found inside grocery stores and are

considered "in-store" locations. Each of defendant's stores are graded on a scale of one to five based on the volume and sophistication of the transactions handled. A "grade five" store may process as many as 18,600 to 30,000 transactions per month, while a "grade two" store typically processes 7,000 transactions per month. Some grade five stores employ 20 or more tellers, at least 10 bankers, multiple lead tellers, up to two Service Manager One (SM1) employees, up to two SM2's, and a store manager. These stores tend to be located in densely populated urban areas, and experience more complex, business-related customer transactions. In contrast, lower-graded stores tend to be located in rural or suburban areas, or are in-store locations, and will have less than 10 employees. These locations will more frequently service customers interested in opening personal accounts or seeking assistance with home equity lines and loans. Such stores usually will not have any SM1 personnel. In such cases, the SM2 spends more time doing tasks that otherwise could be performed by an SM1. During the time period relevant to this lawsuit, defendant has employed approximately 2,600 individuals in the SM2 position in its California branch locations.

Within each bank store, there are "service" and "platform" sides of the business. The "platform," or sales, side is managed by the store manager, who is responsible for managing the bankers, the assistant store manager (if there is one), as well as the SM2. SM2's manage the service side of the store. Their duties include scheduling, hiring, coaching, evaluating, training, and otherwise managing the tellers, lead tellers, and, if applicable, SM1 personnel.[1] An SM2 may also have authority to approve transactions above the authority limits of other employees, and handle escalated customer disputes.

---

[1] The SM2 job description states: "Manages the teller services function to ensure prompt and efficient transaction processing and the generation of sales through quality referrals. This job's primary (greater than 50% of time) duty is the management and direction of work for a minimum of two FTE's. Establishes sales referral and service goals. Creates, trains and coaches a successful service and referral team. Responsible for effective staff salary administration and rewards. Is responsible for scheduling staff efficiently to maximize resources and achieve service and sales goals. Ensure compliance with audit and operational regulations and guidelines. 2+ years interacting with people or customers and 1+ year of work direction or management experience."

SM2's also may fill in for tellers if the store is short-staffed. They also have input in personnel decisions.

A large part of the job duties of an SM2 is internally referred to as "stagecoaching." Defendant requires that SM2's devote 70 percent of their time to stagecoaching their direct reports. Stagecoaching is not a discrete function, as it entails observing, coaching, motivating, evaluation of the tellers, lead tellers and SM1's in the performance of their duties to ensure that they provide good customer service, follow proper procedures in processing customer transactions and that they take advantage of opportunities to promote defendant's products that may be of interest to its customers.

## II. Procedural History

On June 23, 2009, plaintiffs filed a first amended complaint (FAC) on behalf of themselves and others similarly situated, alleging that defendant had misclassified SM2's as exempt employees. The FAC states the following causes of action: (1) failure to pay overtime wages; (2) failure to provide meal and rest periods; and (3) unfair business practices. The FAC identifies the plaintiff class as: "[A]ll California residents who are current and former employees of Wells Fargo, who held any position as all 'Service Manager II's' by defendant Wells Fargo and who worked more the [*sic*] than eight (8) hours in any given day and/or more than forty (40) hours in any given week during the period commencing on the date that is within four years prior to the filing of this complaint and through the present date (the 'Class Period'), and who were not paid overtime compensation pursuant to the applicable Cal. Lab. Code and Industrial Welfare Commission Wage Order Requirements." The class also consists of SM2's "who were not provided with meal and rest periods as required by the applicable Labor Code and [Industrial Welfare Commission] Wage order Requirements . . . ."

On March 22, 2011, plaintiffs filed their motion for class certification.

## A. Evidence Before the Court for Class Certification

In support of their certification motion, plaintiffs submitted the declarations of Vuong, Fleming, and two other putative class members, which in similar language described the tasks they performed as SM2's. Additionally, plaintiffs submitted

3

deposition transcript excerpts from the depositions of Vuong and members of defendant's management staff, defendant's responses to interrogatories, and copies of job descriptions. Plaintiffs later filed a declaration of Burton McCullough, a purported expert on banking practices.[2]

Defendant opposed plaintiffs' motion and submitted declarations of a member of its corporate staff, 14 persons currently employed as SM2's, and four other bank employees, most of whom had formerly worked as SM2's. Defendant also submitted deposition transcript excerpts from the depositions of the named plaintiffs and another putative class member, along with two members of defendant's corporate staff.

In their briefing below, plaintiffs argued that "Because stagecoaching consists of a discrete and finite set of tasks, and the record shows that stagecoaching accounts for more than half of *all* SM2s' time, the Court at trial will be able to determine whether each of the stagecoaching tasks is exempt or not, and therefore liability can be decided on a classwide basis." Plaintiffs asserted they could prove at trial that all the identified stagecoaching tasks are nonexempt activities.[3]

## B. Hearing on the Motion for Class Certification

At the hearing on plaintiffs' motion, the trial court initially determined that the class was not certifiable due to a problematic class definition. First, the definition improperly identified the class as consisting of California residents who had worked for defendant, rather than persons who worked *in* California for defendant. Second, it did not properly identify the correct Wells Fargo entity. The relevant time period was also improperly defined and included an imprecise tolling provision

More fundamentally, the trial court concluded plaintiffs had not met their burden to prove that use of the class mechanism was appropriate. The court found this case was

---

[2] Defendant has objected to the introduction of this declaration. In light of our conclusions, we find it unnecessary to address defendant's evidentiary objections.

[3] On appeal, plaintiffs state that stagecoaching consists of the following activities: "walking up and down the teller line, listening to the interaction between tellers and customers, approving check, deposit and credit card transactions, instructing tellers on applicable bank procedures for these transactions, looking for sales opportunities, pitching sales to customers, handling customer service issues (often involving waiving fees) and accompanying tellers to the vault for cash."

4

factually similar to *Dunbar v. Albertson's, Inc.* (2006) 141 Cal.App.4th 1422 (*Dunbar*), a case from this court involving grocery store managers (discussed further below). The trial court noted: "Each day's performance [of the work done by the putative class members in *Dunbar*] depended on the exigencies of what was going on at the time, and you could learn nothing from analyzing any particular employee purported class member's job except that individual person, which is antithetical to the concept of class resolution." For similar reasons, the trial court here determined this matter could not be handled collectively as a class action because common questions did not predominate over individual ones.

In particular, the trial court emphasized that the concept of stagecoaching is not a singular job duty. Instead, it is "a bundle of tasks with a great variety of permutations as to what a stagecoacher does on any particular day or over any period of time." The evidence showed that an SM2's work varied according to the type of customer being served, whether other non-customer-related bank business was being conducted in the store, the size and location of the store, the performance and experience of the nonexempt employees, the SM2's management style, and whether additional supervisory personnel were employed in the store. Further, many of these factors could vary from day to day within a given location. Thus the court concluded there was no community of interest, no predominant question of fact, and nothing would be gained from grouping the potential plaintiffs together to determine whether they were entitled to protection under California's wage and hour laws. In rendering its decision, the court stressed it was not making any determinations as to whether any of the potential class members were exempt or nonexempt. The central finding was that "each of these people's jobs is so particularized and so variable that using the class mechanism will get us nowhere."[4]

Plaintiffs protested that their circumstances were distinguishable from those at issue in *Dunbar*. They claimed stagecoaching is comprised of a finite discrete set of tasks that account for over 50 percent of an SM2's workday. If all these tasks themselves

---

[4] The trial court also observed that the named plaintiffs could potentially be inappropriate class representatives, due to challenges affecting their credibility.

were determined to be nonexempt, then the case could be tried on a group-wide basis. Defense counsel countered that many of the tasks involved in stagecoaching do, in fact, involve judgment and discretion, and therefore the work could not be deemed nonexempt. In response, the trial court clarified that it was not analogizing SM2's to the store managers in *Dunbar,* or saying that the two jobs were similar. Instead, the difficulty in the present case was that the tasks performed by one person on a particular day did not shed light on what that person was going to do on any other given day. Nor did it reveal anything as to the job tasks performed by any other SM2.

## C. *The Trial Court's Order Denying Plaintiffs' Motion for Class Certification*

On March 12, 2012, the trial court filed its order denying plaintiffs' motion for class certification. The court concluded plaintiffs had "failed to prove that common questions of fact and law predominate over individualized inquiries, that Plaintiffs' claims are typical of those of the purported class, that Plaintiffs would be adequate class representatives, or that a class action is a superior method of adjudication." This appeal followed.

### DISCUSSION

## I. *Class Actions and Standard of Review*

Class actions in California are governed by Code of Civil Procedure section 382, authorizing such suits "when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court . . . ."

"To obtain certification, a party must establish the existence of both an ascertainable class and a well-defined community of interest among the class members. [Citations.] The community of interest requirement involves three factors: '(1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class.' [Citation.] Other relevant considerations include the probability that each class member will come forward ultimately to prove his or her separate claim to a portion of the total recovery and whether the class approach would actually serve to deter and

6

redress alleged wrongdoing." (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435 (*Linder*).) It is the plaintiff's burden to support each of the above factors with a factual showing. (*Hamwi v. Citinational-Buckeye Inv. Co.* (1977) 72 Cal.App.3d 462, 471–472.)

"A trial court ruling on a certification motion determines 'whether . . . the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' [Citations.]" (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326 (*Sav-On*).) Trial courts are afforded great discretion in ruling on class certification issues because they are better situated to evaluate the efficiencies and practicalities of permitting a group action. (*Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal.4th 1096, 1106; *Linder, supra,* 23 Cal.4th 429, 435.) A ruling on a motion for class certification is reviewed for abuse of discretion. (*Sav-On, supra,* at p. 326.) When there is substantial evidence supporting a court's ruling, it will not generally be disturbed unless the court employed improper criteria or made erroneous legal assumptions. (*Id.* at pp. 326–327.)

## II. *Exemptions from Wage and Hour Laws*

Labor Code section 1173 granted the Industrial Welfare Commission (IWC) a broad mandate to regulate the working conditions of employees in California, including the setting of standards for minimum wages and maximum hours.[5] (See *Industrial Welfare Com. v. Superior Court* (1980) 27 Cal.3d 690, 701–702) To that end, the IWC promulgated 17 different "wage orders" applying to distinct groups of employees. (See Cal. Code Regs., tit. 8, §§ 11010–11170.) At issue in this case is Wage Order No. 4-2001, which governs the wages and hours of employees in "Professional, Technical, Clerical, Mechanical, and Similar Occupations." Codified in title 8, section 11040 of the

---

[5] " 'The IWC, established by the Legislature in 1913, was the state agency authorized to formulate the regulations, or wage orders, that govern employment in California. [Citation.] In fulfilling its broad statutory mandate to regulate wages, hours, and working conditions of California employees, the IWC acted in a quasi-legislative capacity. [Citation.] Although the IWC was defunded effective July 1, 2004, its wage orders remain in effect. [Citation.]' [Citation.]" (*California Correctional Peace Officers' Assn. v. State of California* (2010) 188 Cal.App.4th 646, 651.)

California Code of Regulations provides that portions of wage order No. 4-2001—including provisions relating to overtime pay, meal and rest periods and wage statements—do not apply to "persons employed in administrative, executive, or professional capacities." (Cal. Code Regs, tit. 8, § 11040, subd. (1)(A); see also *United Parcel Service Wage & Hour Cases* (2010) 190 Cal.App.4th 1001, 1010 [describing the same exemption applicable to transportation industry workers codified in Cal. Code Regs., tit. 8, § 11090, subd. (1)(A)]. These exemptions are affirmative defenses, so an employer bears the burden of proving that an employee is exempt. (*Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 794–795.) In its papers opposing class certification, defendant relied on the administrative and the executive exemptions.

For the executive exemption to apply, the employee must: (1) manage "a customarily recognized department or subdivision"; (2) "customarily and regularly direct[] the work of two or more other employees"; (3) have the authority to hire or fire other employees, or have "[his or her] suggestions and recommendations" as to the status of other employees given particular weight; (4) "customarily and regularly exercise[] discretion and independent judgment"; (5) be "primarily engaged in duties which meet the test of the exemption";[6] and (6) earn a monthly salary equivalent to no less than two times the state minimum wage for full-time employment. (Cal. Code Regs., tit. 8, § 11040, subd. (1)(A)(1)(a-f).)

For the administrative exemption to apply, the following conditions must be met: (1) the employee's duties and responsibilities must involve "[t]he performance of office or non-manual work directly related to management policies or general business operations of his/her employer or his employer's customers"; (2) the employee must "customarily and regularly exercise[] discretion and independent judgment"; (3) the employee must "perform[] under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge"; (4) the employee

---

[6] The term "primarily" as used in California Code of Regulations, title 8, section 11040, subdivision (1)(A)(1)(e) ("*primarily* engaged in duties which meet the test of the exemption" [italics added]) is defined to mean "more than one-half the employee's work time." (Cal. Code Regs., tit. 8, § 11040, subd. 2(N).)

8

must be "primarily engaged in duties that meet the test of the exemption"; and (5) he or she must earn a monthly salary equivalent to no less than two times the state minimum wage for full-time employment. (Cal. Code Regs., tit. 8, section 11040, subd. (1)(A)(2).)

Although it is the employer's burden to plead and prove the necessary facts to establish an exemption at trial, it is the plaintiffs' burden in a motion for class certification to show that common issues of law and fact predominate with respect to the elements of an exemption that would be at issue at trial. (See *Walsh v. IKON Office Solutions, Inc.* (2007) 148 Cal.App.4th 1440, 1450 (*Walsh*) ["The affirmative defenses of the defendant must also be considered, because a defendant may defeat class certification by showing that an affirmative defense would raise issues specific to each potential class member and that the issues presented by that defense predominate over common issues"].)

## III. Contentions on Appeal

### A. Whether Individual Issues Predominate

Plaintiffs first focus on the issue of whether stagecoaching activities involve the requisite discretion and independent judgment to qualify for either the administrative or the executive exemptions.[7] They assert that because all SM2's spend more than 50 percent of their time stagecoaching, "answering the stagecoaching discretion and independent judgment question for one class member answers it for all class members." They claim the trial court erred in equating the instant case with *Dunbar* because this "overarching common question . . . plainly predominates over any individual questions." They also contend the determination of whether the SM2's satisfy the "qualitative component" of the administrative exemption test, namely, whether stagecoaching

---

[7] Federal regulations incorporated into Wage Order No. 4 provide the following regarding the requirement for exemptions that the employee exercise discretion and independent judgment: "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." (29 C.F.R. § 541.202(a) (2012).) "The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision. However, employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level." (29 C.F.R. § 541.202(c) (2012).)

9

activities are "directly related" to management policies or general business operation, can be resolved on a class-wide basis. For this portion of their brief, they rely heavily on *Harris v. Superior Court* (2012) 207 Cal.App.4th 1225, a case that was ordered depublished after their brief was filed. Further, as to the executive exemption, plaintiffs assert they demonstrated that the question of whether SM2's manage a recognized department or subdivision of defendant is a common question that can be fairly litigated on a classwide basis in that it can be resolved by facts concerning the organization and management structure that is common to all stores.

In *Dunbar,* this court affirmed an order denying a motion for certification in an overtime wage and hour case involving the executive exemption. *Dunbar* concerned unpaid overtime of grocery store managers. The plaintiff contended the majority of the grocery managers' worktime was spent in the "allegedly nonmangerial tasks of 'walking the floor' to verify that inventory was properly stocked, stocking shelves, organizing the stock room, unloading new merchandise, responding to customer questions, cashiering, putting price tags on items, checking inventory, and doing routine paperwork." (*Dunbar, supra,* 141 Cal.App.4th 1422, 1424–1425.) The store defended a motion for class certification by asserting that individual issues predominated. It contended that store operations varied depending upon store size, hours, and location, and that the managers' duties varied accordingly. Further, the proportion of time store managers spent on various tasks also depended upon the type of departments (florist, photo lab, bakery, Starbucks, butcher shop) found within each store, the demographic makeup of the community, the incidence of criminal activity, and management style. (*Id.* at p. 1427.)

The trial court in *Dunbar* relied on evidence that the work performed by the managers varied significantly from "store to store and week to week," and concluded individual issues predominated. (*Dunbar, supra,* 141 Cal.App.4th 1422, 1429.) The court acknowledged there were common issues, such as whether stocking shelves and operating cash registers are managerial tasks. However, it indicated that the tasks performed by the managers were so dissimilar that it could not "reasonably extrapolate findings from the named plaintiff to the absent class members." (*Id.* at p. 1430; see also

10

*Walsh, supra,* 148 Cal.App.4th 1440, 1454–1456 [record contained substantial evidence that the determination of whether each account manager was exempt from overtime would require an individual determination because of variance in the way they performed their duties].)

On review, we affirmed the trial court's order, observing that "the presence of individual liability issues was only one factor, not the controlling factor, in the court's decision. The most important consideration, in the court's view, was the significant variation in the grocery managers' work from store to store and week to week. In light of that variation, the court evidently believed that very particularized individual liability determinations would be necessary." (*Dunbar, supra,* 141 Cal.App.4th 1422, 1431.)

Plaintiffs here attempt to distinguish *Dunbar,* claiming individual inquiries will not be necessary because it is undisputed that every SM2 spends more that half of each workday on stagecoaching tasks. They argue that the determination of the exempt/non-exempt status of stagecoaching is a common issue that predominates over any individual issues that might thereafter remain. They further reason that resolving the status of stagecoaching will resolve the exempt/non-exempt status of all putative SM2 plaintiffs, making the class action a superior method of adjudication for this case.

As defendant correctly observes, even if SM2's spend more than 50 percent of their time stagecoaching, this fact does not support class certification because stagecoaching is not a single activity. Instead, it is merely a name ascribed to a bundle of managerial duties, and the time spent performing those duties and other exempt duties varies across all the SM2's depending on a number of factors. In particular, the trial court noted variations based on "the necessities of the day," size and location of the bank store, the performance and experience level of nonexempt branch employees, and the management style of the SM2's. Plaintiffs essentially are arguing that the mere use of a job description, or a catch-phrase that describes a set of managerial duties, creates a common issue that predominates. This argument was rejected in *Arenas v. El Torito Restaurants, Inc.* (2010) 183 Cal.App.4th 723, 734 (*Arenas*).

11

The appellate court in *Arenas* found the issue of whether restaurant managers were misclassified on the basis of their job descriptions was not an issue subject to common proof where the evidence showed variations in how their work was actually performed: "Here, the trial court credited [the defendants'] evidence to the effect that managers' duties and time spent on individual tasks varied widely from one restaurant to another. The trial court concluded plaintiffs' theory of recovery—that managers, based solely on their job descriptions, were as a rule misclassified—was not amenable to common proof." (*Arenas, supra,* 183 Cal.App.4th 723, 734.)  Following the required deferential standard of review, the appellate court affirmed this conclusion.

In the present case, we agree with defendant that because stagecoaching is not a singular function, it is not possible to determine, as plaintiffs suggest, whether stagecoaching itself is an exempt or nonexempt task.  The relative inquiry would instead focus, as in *Dunbar,* on the percentage of time expended on each of the duties that SM2's perform, including those duties that comprise stagecoaching.  We also agree that substantial evidence supports the trial court's conclusion that the amount of time any SM2 spends on any particular duty varies day-to-day, making class-wide adjudication of the exemption issue inappropriate.  As was indicated in *Dunbar, supra,* 141 Cal.App.4th 1422, 1431–1432, "[T]he court's decision was not based on the mere presence of individual liability issues; it turned on the *nature* of these issues as shown by defendant's evidence.  The decision was thus on solid legal footing.  '. . . "[T]he community of interest requirement is not satisfied if every member of the alleged class would be required to litigate numerous and substantial questions determining his individual right to recover following the 'class judgment' determining issues common to the purported class.  (Citation.]"  [Citation.]' "  (Quoting *Frieman v. San Rafael Rock Quarry, Inc.* (2004) 116 Cal.App.4th 29, 40, emphasis in original).

This assessment applies here.  Indeed, the trial court was explicit in stating he saw so many individual issues, class member by class member, day by day, as to amount to "particularized individual determinations" for each member.  "[T]here's no community of interest, no predominant question of fact, and you will gain nothing from putting all of

12

these people into a singular group for singular treatment. . . ." And this conclusion was based on lack of commonality without any determination of whether these alleged members were exempt or nonexempt.

### B. *Whether Substantial Evidence Supports the Trial Court's Order*

The trial court credited defendant's evidence to the effect that the SM2's' duties and the time spent on individual tasks varied widely depending on several different factors. The evidence supports the court's conclusion that this case is inappropriate as a class action.

For example, Fleming testified in her deposition that the duties she performed as an experienced SM2 were "quite different" from the duties of the less-experienced SM2 that she supervised when she later became a store manager. As an SM2, she would do work involving the platform side of the bank. In contrast, the SM2 that she later supervised was "just learning the [SM2] role," which "in itself, was enough to take on." Therefore, she did not ask him to get involved in platform duties. Another consideration impacting an SM2's job duties is the management style of the store manager, in terms of how much they want the SM2's to be involved on the platform side of the bank. Whether an SM2 has a proactive personality is also a factor. Fleming conceded that in trying to determine what a particular SM2 did on a day-to-day basis, one would need to consider that person's experience, the store size, the manager's personality, the individual's personality, and the support people they had working with them. Neither Fleming nor Vuong could quantify the amount of time they spent on a daily or weekly basis performing their various SM2 duties.

Declarations furnished by witnesses, including 15 other SM2's, further confirm individual variation in the performance of job duties. For instance, one SM2 explained that when he works at a level 5 store, she approves 350 transactions monthly, but only needed to approve 150 monthly transactions at his prior level 3 store. Store differences, including staffing, can also impact the amount of time, if any, that an SM2 spends working the teller window. Some SM2's rarely work on the teller window, whereas others may spend up to 25 percent of their time performing teller duties  Seasonal

13

differences in business volume and clientele differences also affect duties. For example, one SM2 stated that since his store is near a mall, it gets very busy around the holidays and he spends less time coaching during this period and instead focuses his attention on resolving customer disputes and scheduling employees appropriately. In sum, substantial evidence supports the trial court's conclusion that class treatment is inappropriate because the material facts vary on an individualized basis.

In their reply brief, plaintiffs again claim that determining whether stagecoaching represents exempt or non-exempt work can be addressed class-wide with common proof because there is no dispute that SM2's spend more than half of their time stagecoaching. They assert again that this factor distinguishes the present case from cases like *Dunbar*. Their argument is not completely lacking in merit. However, "A court may properly deny certification where there are diverse factual issues to be resolved even though there may also be many common questions of law." (*Evans v. Lasco Bathware, Inc.* (2009) 178 Cal.App.4th 1417, 1427.) Here, although defendant maintained uniform internal policies, the evidence showed that the manner in which those policies and standards were carried out by each SM2 varied depending on multiple factors. Thus, as a factual matter, individual inquiries would be needed to determine the time spent performing each of the allegedly nonexempt duties that comprise stagecoaching.

Further, it is settled that "The issue of *whether* the work is exempt or nonexempt is not germane to a determination of class certification." (*Walsh, supra,* 148 Cal.App.4th 1440, 1460.) The trial court made it clear that it was not judging the case on its merits. Accordingly, there is nothing to indicate that the court either employed improper criteria or made erroneous legal assumptions in finding a lack of commonality. Substantial evidence supports this finding. In light of that finding and applying, as we must, the deferential standard of review articulated in *Sav-On, supra,* 34 Cal.4th 319, we necessarily hold the court reasonably concluded the putative class representatives' theory of recovery was not susceptible of common proof.

14

## C. Meal and Rest Break Claims

In a footnote in its responsive brief, defendant contends that even if we were to reverse the trial court's decision with respect to plaintiffs' wage and hour claims, their meal and rest break claims would still not be suitable for class treatment. Plaintiffs do not address the status of their meal and rest break claims in their opening brief on appeal. In their reply brief, they counter defendant's argument by asserting that it rests on the erroneous assertion that *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004 (*Brinker*), requires only that an employer ensure meal and rest breaks are available to employees, and need not ensure that the breaks are actually taken.[8] As we are affirming the trial court's order in its entirety, we need not address defendant's contention regarding the meal and rest break claims. To the extent plaintiffs suggest these claims are independently viable, we need not consider an argument raised for the first time in a reply brief. (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764–766.)

---

[8] In *Brinker,* the Supreme Court summarized its holding as follows: "An employer's duty with respect to meal breaks . . . is an obligation to provide a meal period to its employees. The employer satisfies this obligation if it relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted 30-minute break, and does not impede or discourage them from doing so. What will suffice may vary from industry to industry, and we cannot in the context of this class certification proceeding delineate the full range of approaches that in each instance might be sufficient to satisfy the law. [¶] On the other hand, the employer is not obligated to police meal breaks and ensure no work thereafter is performed. Bona fide relief from duty and the relinquishing of control satisfies the employer's obligations, and work by a relieved employee during a meal break does not thereby place the employer in violation of its obligations and create liability for premium pay . . . ." (*Brinker, supra,* 53 Cal.4th 1004, 1040–1041.)

## DISPOSITION

The order is affirmed.

_____
Dondero, J.

We concur:

_____
Margulies, Acting P. J.

_____
Banke, J.

16